ESTATE OF CLARENCE B. EATON, DECEASED, MURL P. EATON, EXECUTRIX, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

MURL P. EATON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

JAMES M. SMITH, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

MINNIE I. SMITH, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 12099, 12100, 12101, 12102. Promulgated May 18, 1948.

870

*Clyde C. Sherwood, Esq.*, and *John V. Lewis, Esq.*, for the petitioners.

*W. J. McFarland, Esq.*, for the respondent.

874

OPINION.

JOHNSON, *Judge*: *Issue No. 1.*—The first issue relates to depreciation. In computing deductions for depreciation on items of machinery and motor vehicles in each of the taxable years the partnership followed its established practice of prior years, theretofore acquiesced in by the Commissioner, in assigning a four-year useful life to each item acquired new and a two-year useful life to each item acquired in used condition. Petitioners admit that there was in fact no such uniformity in depreciation as to each item individually, but contend that their experience over the years demonstrated its accuracy as a convenient and general method, and that, since the accounting practice truly reflects the average useful life of their equipment, it should be approved. Although he had always accepted it for preceding tax determinations, the Commissioner, for the taxable years in question, rejected petitioners' composite rate as inaccurate, and determined a useful life for each item. He compiled new depreciation schedules which reflect the difference between the individual amount claimed as depreciation on the schedules of the tax returns and the lesser amount which he has computed and allowed. He added the aggregate excess to income for each of the taxable years.

From the evidence adduced we are unable to accept the determined changes. The partnership accounting method, fortified by experience with use of equipment, is not to be lightly set aside. See *Lake Charles Naval Stores*, 25 B. T. A. 173, wherein we said:

> The reasonableness of a deduction for any particular year depends to some extent upon what has been done in former years. Ordinarily the uniform methods applied in former years should not be abandoned in later years, but should be followed in those years unless there is a cogent reason for a change.

Petitioners introduced much persuasive evidence on this issue, while respondent offered none to rebut it except Bulletin F and a compilation of the large sums expended for repairs of the equipment in the taxable years. He argues that useful life was materially extended thereby, but offered no evidence that this was so or that his computation as to useful life conformed to the schedules in Bulletin F. Petitioners' evidence convinces us that the large amounts expended for repairs kept the machinery and equipment in working condition, but did not extend useful life. Under pressure of the war emergency, the equipment was put to continuous use under adverse conditions. Between 20 and 25 per cent of its cost had already been written off as depreciation, and, while normally unusual repairs might have prolonged this use, this advantage, in our opinion, was more than offset by the abnormal depreciation in the taxable years. We find that aver-

age life was no greater than the partnership's estimate and hold that the Commissioner erred in disallowing any part of the depreciation claimed by petitioners.

*Issue No. 2.*—The second issue is whether amounts received by the partnership during 1941 and 1942, under the terms of the so-called Benicia contract with the United States Government, constituted ordinary income or, as contended by petitioners, represented capital gain.

In computing income of the partnership for 1941, the Commissioner treated $53,505.55 as rental for the use of equipment, automobiles and trucks. For 1942 he so treated $52,716.30, and for the same year added to income, $16,859.19 representing the excess of $172,912.35 (now stipulated as $155,362.35), which the partnership received from the Government upon transferring to it the rented equipment, over the equipment's cost ($289,278.84) less depreciation ($133,223.68). The three payments were made pursuant to the construction contract's provisions relating to reimbursements and rentals for plant and equipment used in performance. The Commissioner determined that the $53,505.55 received in 1941 and the $69,575.49 ($52,716.30 plus $16,-859.19) received in 1942 were taxable as ordinary income derived from the contract. Petitioners assail this determination, contending that the three payments constituted the selling price of the several items of equipment, and that, as the partnership had held these items over six months, that part of the receipts which represents profit from the sale is taxable as a capital gain.

This issue results from the Government's exercise of an option. Under article II of the contract the Government agreed to make reimbursement for certain expenditures incurred in performance and to pay rental for the constructor's equipment used. It was provided, however, that:

Art. II, sec. 2: \* \* \* at the completion of the work or upon termination of the contract as provided in Article VI, the Government may at its option purchase any part of such construction plant by paying to the constructor the difference between the valuation of such part or parts, plus one per-cent (1%) per month for each month or fraction thereof such part or parts have been in use and the total rental theretofore paid for such part or parts \* \* \*.

It is stipulated that Eaton & Smith furnished certain machinery, equipment, trucks, and automobiles used in performance; that the Government paid them the amount in controversy "for the use" of the several items in 1941 and 1942, and on April 30, 1942, exercised its purchase option. The parties agreed that the equipment here involved then had a value of $242,436.57, to which $19,147.63 was added, representing 1 per cent for each month of use. The total of $261,584.20

was then reduced by $106,221.85 already paid as rentals in 1941 and 1942 ($53,505.55 in 1941 and $52,716.30 in 1942), and the Government paid the remainder of $155,362.35.

Respondent defends the theory on which the determination is based, arguing that the Government was not interested in acquiring equipment, but included the optional purchase provision in the contract as a measure to forestall abuses and as an incentive for the constructor's dispatch and efficiency; that, viewed on this background of intent, the transfer of the equipment and the payment of April 30, 1942, lose their character as elements of a sale transaction, and that the full amount received by petitioners was ordinary income from the contract, while cost of the equipment was merely a factor in its computation. He points out that if the contract date, June 18, 1941, be deemed the date of sale, then the property is not depreciable; that if April 30, 1942, be deemed the date of sale, then petitioners are confronted "with an insurmountable problem" in characterizing the amounts previously received, a part of which was actually reported as rentals in the partnership's 1941 return. He aptly cites *Burnet* v. *Sanford & Brooks Co.*, 282 U. S. 359, to the effect that each year of accounting must stand by itself. In case this argument be rejected, he suggests alternatively that in any event the amounts received as "rentals" prior to the Government's exercise of the purchase option must be taxed as ordinary income, citing *Indian Creek Coal & Coke Co.*, 23 B. T. A. 950.

Petitioners argue to the contrary that the payments were received and the items of equipment were transferred pursuant to a contract of sale and purchase, and that the transaction falls within the "plain and unambiguous" language of section 117 (j), Internal Revenue Code. Inferentially conceding that the sale occurred on April 30, 1942, they assert that the amounts already paid as rentals "were applied by the Government on the agreed purchase price," and conclude that such payments then "lost their character as rentals and were properly reported by Eaton & Smith as receipts from the sale of machinery and equipment used in its business and held for more than six months prior to the time of sale."

The contentions advanced by each party do not, in our opinion, take adequate cognizance of the wording of the contractual provision under which the payments were made and the equipment transferred. Each has postulated an identity of character in the amounts paid before exercise of the option and in the amount paid simultaneously therewith. We find no justification for this assumption in the language of the contract. Article II, section 2, clearly and consistently provides for the leasing of the equipment by the partnership and the payment of rentals by the Government. But section 2 provides further that on

completion or termination of the contract, the Government may elect to purchase for a price computed as the difference between valuation plus 1 per cent for each month of use and the total rentals theretofore paid. Clearly then the rentals are not an element of the purchase price, but constitute merely one of several factors in its computation. They were not "applied" to that price, but, on the contrary, were expressly excluded from it under the prescribed formula. The $53,505.55 was received by the partnership in 1941; the $52,716.30 in 1942. As rentals they were taxable as ordinary income. No provision of the contract relating to the purchase option purports to alter this character. When the Government exercised that option, the parties agreed on a valuation of $242,436.57 for all the equipment items here involved; they agreed on $19,147.63 as the addition representing 1 per cent for each month of use. But the sum of these figures, $261,-584.20, was not the purchase price. That price was the difference between $261,584.20 and "the total rentals theretofore paid," $106,-221.85, which difference was $155,362.35. This last amount and only this was paid to the partnership as consideration for purchase of the machinery and equipment.

Each party has quoted extensively from Congressional committee reports, invoking legislative intent as giving color and support to each of the conflicting contentions. But, as the wording of the contract presents no inconsistencies or conflicts, we perceive no necessity for any tortuous construction of section 117 (j) or other applicable sections of the code. We hold that the machinery and equipment was first leased, and the rentals received for their use constituted ordinary income. On April 30, 1942, they were sold for a price which expressly excluded amounts already paid as rentals. This price of $155,362.35 represents the sale proceeds, and, as the assets had been held over six months, the profit from the sale is taxable as a capital gain.

*Issue No. 3.*—What portion of the partners' income from Eaton & Smith during 1941, 1942, and 1943 was income from their separate property, and what portion of it was community income of the individuals, Eaton and Smith, and their respective wives?

In California the property of spouses is held subject to the law of community property. By section 161 (a), Civil Code of California, effective July 29, 1927, the wife acquired an immediate half interest in acquisitions of the community so that each spouse became thereafter taxable on one-half of the community income. *United States* v. *Malcolm*, 282 U. S. 792; *J. Z. Todd*, 3 T. C. 643. Property of the community owned on that date is to be treated for income tax purposes as the husband's separate property. *Hirsch* v. *United States*

(C. C. A., 9th Cir.), 62 Fed. (2d) 128. The firm Eaton & Smith was formed long prior to 1927, was a going concern on that date, and the capital then employed in the firm's business was the separate property of the partners. Since the partners were then married, and remained so, the income which the firm earned thereafter, under the law of California, was subject to allocation between the separate and the community estate of the firm members. That portion of such income attributable to capital was separate property, while that attributable to the "personal character, energy, ability and capacity of the husband" was community property of the two partners and their respective wives. See *Pereira* v. *Pereira*, 156 Cal. 1; 103 Pac. 488; *McDuff* v. *McDuff*, 48 Cal. App. 175; 191 Pac. 957; *In re Gold's Estate*, 170 Cal. 621; 151 Pac. 12; *Cozzi* v. *Cozzi* (Aug. 1947), 183 Pac. (2d) 739; *In re Caswell's Estate*, 288 Pac. 102: *Witaschek* v. *Witaschek*, 132 Pac. (2d) 600.

The parties are agreed that the income for the taxable years is attributable in part to capital and in part to the personal services of the partners Eaton and Smith; they are in disagreement, however, as to the amounts of such allocation and the method of determining same.

Petitioners contend that the earnings and profits of Eaton & Smith for the taxable years were due in part to the capital invested, but were primarily due to the personal activities, management, skill, judgment, experience and hard work of the two partners, and therefore that 7 per cent on the capital invested is all that should be attributed to capital or separate property, and that the entire balance of the income should be attributed to the personal services of the two partners and hence constitutes community property income of them and their wives. They cite *Lawrence Oliver*, 4 T. C. 684, and *Ashley Manning*, 8 T. C. 537, wherein we upheld that method of allocation. Such method of apportionment also finds support in *Pereira* v. *Pereira, supra*, wherein the Supreme Court of California held that "when the principal part of the income was due to the personal character, energy, ability and capacity of the husband," that portion of the income was the community property of the husband and wife, but that the separate property reflected in the capital invested should also be credited with some part of the income as profit on capital, same to be determined from the facts of the case, but in an "amount equal to the usual interest on a long investment well secured."

Respondent's contention, on the contrary, is that the capital and equipment of the partnership of Eaton & Smith were the vitally important factors in producing the firm income, and that the efforts, ability and resourcefulness of the partners were not primarily responsible for the partnership earnings, and hence, in determining the

apportionment, the formula prescribed in G. C. M. 9825 is applicable here, and cites *Todd* v. *Commissioner*, 153 Fed. (2d) 553; *J. Z. Todd*, 3 T. C. 643, and 7 T. C. 399; and *Clara B. Parker, Executrix*, 31 B. T. A. 644.

Whether capital or personal services predominate in the production of a firm's income is always more or less difficult to determine. Each case must be decided upon its own particular facts and circumstances. The facts in no two cases are ever identically alike, and it is conceivable that, where two different firms are engaged in the same kind of business, the difference in the way the businesses are conducted and the difference in the character, energy, and capacity of the members of the two firms will be such that in one capital predominates in producing income, while in the other personal services are mainly responsible therefor. The aggregate assets of Eaton & Smith during the taxable years were about a million dollars, and of this amount the working capital constituted normally a minor part, the fixed assets accounting for only $100,000 to $200,000, invested principally in equipment. Respondent says that without this equipment the firm could not have carried on their business and, therefore, no profits would have been received, and hence capital played the major role in the production of income.

In *Pereira* v. *Pereira, supra,* the California Supreme Court, in its opinion, likewise said that without capital the business could not have been carried on, and yet it held under the facts of that case that capital played a minor part, even though it was essential to the conduct of the business. Such we think is the case here.

Continuous and profitable operation of a general construction and contracting business for more than 30 years is so unusual as to constitute proof of the competency of its founders and administrators. The stipulations recite that both Eaton and Smith, throughout the entire partnership, "actively managed, conducted and carried on the business." Oral testimony supplemented and elaborated in detail their fitness and qualifications for the work and the vital part they played personally in the firm's success.

Typical of the testimony of five competent and disinterested witnesses is that of Paul B. Fay, director of the Bank of America, a paving contractor and competitor who knew Eaton and Smith from the time that they worked for the city of San Francisco and was familiar with their work from long observation. Answering the question as to what factor he attributed the success of the firm, he said:

I attribute it to a fine combination. They built a good foundation in the Engineering Department of the City and County of San Francisco, acquiring by observation just what should be the proper procedure to follow in contracts. Then Jim Smith went in for what you call the "long hours of work" and the

hard part of it, and Clarence went in for the engineering and the financial end of it. It was a wonderful combination. That is what I would say.

\* \* \* \* \* \* \*

\* \* \* the thing that made for the success of Eaton and Smith also was their ability to pick out the right men and put them on the job.

Further, he testified that their work was always efficiently done and that:

\* \* \* they enjoyed a reputation of always finishing up their work in good workmanlike way. They had the confidence of all the engineers, whether it was in the City or County of San Francisco or in the State. Lots of times we had parallel jobs and I would hear the comments from the different engineers.

Capital was never a major factor in the production of the firm's income. The partnership was formed when Eaton and Smith were young men, without funds to contribute. They made a profit of $35,000 on their first contract, which was left in the business, and such capital and assets as they used were derived from profits accumulated over the years from their business. Although their construction contracts during the taxable years involved the expenditure of many millions of dollars, the balance sheet summary indicates very small working capital, of which $100,000 to $200,000 only was invested in equipment; little cash was kept on hand, and less inventory of supplies. The partners' financial and commercial standing enabled them to procure large monthly advances from the customers or bank loans to meet current costs and expenses. Without this personal standing, the firm might well have required a large amount of working capital to tide over until payment for the contract was received, but confidence in their ability and integrity made this unnecessary. The witness, Fay, a bank director, testified that the banks would advance pay roll funds to contractors such as Eaton & Smith, who were known to have ability and character and had shown by experience what they could do, even if they had no capital. In most contracts credit for the first month was about all that was required, as thereafter progress payments alone were sufficient to carry on. "I would put capital as a very small item" said he.

We think the respondent's allocation was in error, and hold that the profits of the partnership for the taxable years 1941, 1942, and 1943 were due primarily to the personal services of Eaton and Smith; that 7 per cent of the separate capital invested should be attributed to the earnings of capital; that the remainder of the earnings and profits of the partnership should be allocated to the personal services of the individuals, Eaton and Smith; and that such remainder should be allocated as community property of Eaton and Smith and their wives.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*