TRUMAN BOWEN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 12319. Promulgated March 25, 1949.

*Blaine B. Shimmel, Esq., Louis McClennen, Esq.,* and *James A. Smith, C. P. A.,* for the petitioner.

*E. A. Tonjes, Esq.,* and *H. A. Melville, Esq.,* for the respondent.

---

450

452

OPINION.

HARRON, *Judge*: In his original determination respondent applied the provisions of I. T. 3533, C. B. 1941–1, p. 87; as amended by I. T. 3631, C. B. 1943, p. 197. That is to say, he gave recognition to the fact that the Government took title to all of the equipment in 1942 and determined that a proportionate part of the profit, $66,692.36, was allocable to the year 1941. The ruling set forth in I. T. 3533 is one which permits a taxpayer to allocate the profits from a contract, such as we have before us in this proceeding, among the years during which the contract is in force. However, the partnership did not elect to follow the permissive method of reporting income which is set forth therein. In this proceeding petitioner contends that it is not *required* to report income from the contract in question under this ruling, and we think petitioner is correct in that view, as will be shown hereinafter.

Under his answer, the respondent made an alternative affirmative allegation. On the basis of this affirmative pleading, the respondent moved for increase in the deficiency of this petitioner from $26,779.90 to $57,700.31 under the provisions of section 272 (e) of the Internal

Revenue Code. Respondent now contends that the entire amount of the payments received under the contracts in 1941, which aggregated $191,248.49, constituted ordinary rental income to the partnership under section 22 (a) of the Internal Revenue Code. The question presented is whether the 1941 payments represented rents. This question is considered first. Whether or not the 1941 payments under the contract constitute rent depends upon the construction of the contract of March 6, 1941, Government Form No. 40–2111.

The determination of the question whether an agreement is a lease or a conditional sales contract is often difficult. *Union Stock Yards & Transit Co.* v. *Western Land & Cattle Co.*, 59 Fed. 49, 53; *Beckwith Machinery Co.* v. *Matthews*, 57 Atl. (2d) 796, 798; 47 Am. Jur., pp. 24, 25, and 26, secs. 836, 837. In *In Re Rainey*, 31 Fed. (2d) 197, the court stated the distinction as follows:

> The distinction between an ordinary lease and a conditional sale is obvious. A lease contemplates only the use of the property for a limited time and the return of it to the lessor at the expiration of that time; whereas, a conditional sale contemplates the ultimate ownership of the property by the buyer, together with the use of it in the meantime.

See also *Vermont Acceptance Corporation* v. *Wiltshire*, 153 Atl. 199, 200; *Hamilton* v. *Highlands*, 56 S. E. 929.

The determination of whether an agreement is a lease or a conditional sales contract is controlled neither by the form nor by the use of the terms "lease" and "rent." "It is necessary to look through form to substance," *In Re Rainey, supra;* and the "courts will always look to its purpose, rather than to the name given to it by the parties," *Hervey* v. *R. I. Locomotive Works*, 93 U. S. 664, 672; *Schmidt* v. *Boder*, 130 Atl. 258.

Under the Uniform Conditional Sales Act, par. 1:

> A lease is substantially equivalent to a conditional sale when the buyer is bound to pay rent substantially equal to the value of the goods and has the option of becoming or is to become the owner of the goods after all the rent is paid. In such a contract "rent" means the purchase price, and possession as "lessee" means the possession of a buyer under an executory contract of sale. That the buyer, in some cases, has the option of becoming the owner and thus a sale is not sure to take place, is of but small importance, for, as a practical matter, the buyer will always be willing to accept ownership when he has paid the value.

See also Eager, The Law of Chattel Mortgages and Conditional Sales and Trust Receipts, 1941, pp. 388–391; *Jefferson Gas Coal Co.* v. *Commissioner*, 52 Fed. (2d) 120, 122, affirming 16 B. T. A. 1135; *A. B. Watson*, 24 B. T. A. 471, affd., 62 Fed. (2d) 35.

In this proceeding attention is drawn first to the clause in Standard Form 40–2111, the contract which is to construed, which provided that when monthly payments equaled the stated value, plus 1 per cent

per month for each month of use, plus freight (if any), title would pass to the Government; and to the fact that the amounts of the agreed monthly payments, or rental payments, were in such amounts that the payment thereof over a period of from 6 to 10 or 12 months would equal the contract value of an item. It is stated in Jones, The Law of Chattel Mortgages and Conditional Sales, 6th Ed., vol. 3, pp. 66, 67, sec. 958, that such provision in a contract "is a matter of no slight importance, and is uniformly given prominence by the courts in their consideration of the contract's controlling feature."[1] See also Williston on Sales, 2d Ed., p. 780, sec. 336, where it is said that:

Sellers desirous of making conditional sales of their goods, but who do not wish openly to make a bargain in that form, for one reason or another, have frequently resorted to the device of making contracts in the form of leases either with options to the buyer to purchase for a small consideration at the end of the term, provided the so-called rent has been duly paid, or with stipulations that if the rent throughout the term is paid, title shall thereupon vest in the lessee. It is obvious that such transactions are leases only in name. *The so-called rent must necessarily be regarded as payment of the price in instalments since the due payment of the agreed amount results, by the terms of the bargain, in the transfer of title to the lessee.* This has been clearly recognized and many of the statutes relating to conditional sales in express terms include leases within their scope. Apart from statutes courts have disregarded the form of the transaction and have held that where payment of so-called rent nearly or quite pays the price of the goods the bargain is conditional sale and subjct to the rules governing that kind of transaction. [Italics added.]

There was also the provision in Standard Form 40–2111 that upon the termination of the prime or principal contract with the Government, or upon the completion of work, the Government had the right to take title to the equipment upon payment of one final sum which, when added to the monthly payments, would equal value, *if title had not passed automatically under the other provision which has been referred to above.* This part of the clause relating to transfer of title must be considered in the light of the entire contract and, while it is a provision which gives the Government an "option" to acquire title, the purpose of the agreement is made clear by many facts in the record, as will be discussed hereinafter; and we are of the opinion that the dominant purpose was to enable the Government to acquire the equipment.

The record in this proceeding shows that the form of the agreement was required by the Government; that the Government was in need

---

[1] Jones, The Law of Chattel Mortgages and Conditional Sales, 6th Ed. (1933), vol. 3, sec. 958, pp. 66–67 : "In determining whether a particular contract amounts to a conditional sale or a lease, the fact that the aggregate of the installments to be paid as rent up to the time the lessee may become the owner of the property is equal to its value, is a matter of no slight importance, and is uniformly given prominence by the courts in their consideration of the contract's controlling feature. While such a fact is not conclusive as to the intention of the parties, it goes far to show that their real purpose was to enter into a contract of conditional sale, rather than a lease."

of obtaining certain kinds of equipment; that the procedure for doing so was called "recapture"; that lists were made in Washington of the kinds of equipment which the Government would "recapture"; and that such lists were sent to Government contracting officers throughout the country. The clause which provided for the Government's taking title, which is set forth in the findings of fact, enabled "recapture." In addition, the so-called rentals, which stood to increase with overtime operations, were in such amounts in relation to the agreed value as to indicate clearly that the parties had in mind that the payments were for more than just hire of goods. Since the critical clause in the agreement provided for transfer of title to the Government when "rents" equaled value, and provided for payment of 1 per cent per month from the delivery of the item, and, taking into consideration the intent of the Government to "recapture" certain equipment to meet its needs, it was the purpose of the agreement to provide for a sale and purchase in terms of a conditional sales contract. There could be no doubt about that if the critical clause had ended with the provision for transfer of title when "rents" paid equaled value. See Jones *op. cit., supra; Billiter* v. *Ledbetter-Johnson, Contractors, Inc.*, 2 S. E. (2d) 677; *Central Union Gas Co.* v. *Browning*, 131 N. Y. S. 464; modified (but affirmed on conditional sales holding), 103 N. E. 822; *Holeproof Hosiery Co.*, 11 B. T. A. 547; and *Alexander W. Smith, Jr., Executor*, 20 B. T. A. 27.

Under such provision for transfer of title, the parties did not contemplate return of the equipment to the so-called lessor, in all events; and "The so-called rent must necessarily be regarded as payment of the price in installments since the due payment of the agreed amount results, by the terms of the bargain, in the transfer of title to the lessee." Williston on Sales, *supra*.

At the end of 1941 the monthly payments equaled agreed value for one item (No. 8), and were $6 short of equaling agreed value of two items (Nos. 21 and 22).

The issue in this proceeding revolves about the interpretation of the clause in its second aspect wherein the Government could acquire title by paying a final sum which, when added to the monthly "rentals" already paid, would equal value plus 1 per cent. If that provision stood alone, without the first provision for passage of title when monthly payments equaled value, there would be much more doubt about whether the agreement was a conditional sales contract. But in the presence of the first aspect of the clause, the second one, which uses the term "option," is not to be regarded as the controlling factor. The factor is one of small importance. As is said in the Uniform Sales Act, *supra:*

* * * That the buyer, in some cases, has the option of becoming the owner and thus a sale is not sure to take place, is of but small importance, for as a

practical matter, the buyer will always be willing to accept ownership when he has paid the value.

See *Beckwith Machinery Co.* v. *Matthews, supra; Phelan* v. *Stockyards Bank,* 276 Pac. 175, 178; *In Re Rainey, supra; Judson Mills,* 11 T. C. 25; *Helser Machine & Marine Works, Inc.,* 39 B. T. A. 644, 646.

The parties to this proceeding have stipulated that the purchase price was the sum of the monthly payments, plus 1 per cent of value per month, plus freight (if any) ; and that when the Government acquired title to the equipment in 1942 the monthly accruals [payments] were applied on the purchase price, as is set forth in the findings of fact. Also, the evidence shows, apart from the above stipulation of the parties, that the monthly payments, or "rentals," were carried in the agreement itself, in the supplemental schedule A, as "Equity," and that in the Government purchase orders, the "rentals," were applied to the purchase price, which was the value of the item stated in the agreement.

In this proceeding the record shows the amount of the lump sum, final payment which the Government made in 1942 when it acquired title, at various times, to each item of equipment, as well as the amount of the 1 per cent of value increment, and the amount of the monthly payment, for each item. As is stated in the findings of fact, the final payment covered only the 1 per cent of value increment (which was called interest in the purchase orders), or the 1 per cent addition and only the amount of 1 monthly payment, or less, in 9 instances; and the 1 per cent addition and an amount which was less than 2 monthly payments in 12 instances. Thus in the instances of 21 items (out of 62) the final payment was clearly a very small one compared to value. Also, at the end of 1941 the monthly payments for 18 items, on which no further monthly payments were made prior to transfer of title, amounted to from 43 per cent to 101 per cent of the agreed value. Also, at the end of 1941 the monthly payments on 52 items exceeded cost or 50 per cent of cost; and the monthly payments on the 62 items were 43.6 per cent of the total value thereof.

It was said in *In Re Munger Fish Co.,* 9 Fed. (2d) 54, 56, that:

The final payment, which is nominally the purchase price, is so small in comparison with the entire purchase price as to leave no real choice to the "lessee." The obvious purpose was to dispose of the machine under such conditions that when the "lessee" had paid the "rental" he could not afford to fail the relatively small final payment to obtain it. This would have been the obvious and natural, if not the inevitable, result. Evidently, it was what the parties desired and intended to accomplish.

See also *Beckwith Machinery Co.* v. *Matthews, supra;* and *Watson* v. *Commissioner,* 62 Fed. (2d) 35, 36, where it was said:

It is unthinkable that the payment of $47,000, which is about 43 per cent of the entire consideration, upon property valued at $109,000, is an annual rental
* * *

Thus, for example, the final payment for item No. 8 was $1,245.23. The value thereof in the contract was $14,000; the monthly "rent" was $1,350; and the "interest" at 1 per cent of value was $1,120. In many instances the total monthly payments amounted to from 70 per cent to 100 per cent of the value of the item, and the single payment upon acquisition of title was 30 per cent or less of the value, plus the 1 per cent of value increment. It has been found as a fact that the aggregate final payments in 1942 were about 31 per cent of the aggregate value of the 62 items, exclusive of the 1 per cent increment.

In *In Re Rainey*, *supra*, where a similar contract was involved, the court said:

> In the present case the rental of the machinery for three months, the full term of the lease, amounted to 60% of its entire value. A charge so disproportionate to the term of user in relation to the value of the articles, all of which were second hand, in and of itself certainly suggests a sale.

In this proceeding, the facts show such relation of the so-called rental payments to value and that they represented such a substantial portion of value that they constituted more than a mere payment for hire. The testimony of petitioner, that it is likely that the equipment covered by the 1941 contract is still being used today, indicates that the monthly payments were "disproportionate to the term of the user in relation to the value of the articles"; and the evidence shows this to be a fact. The parties have stipulated the amount of the monthly "rental" of each item, and the "rental" was one-sixth to one-fifteenth of value, as a schedule in the findings of fact demonstrates. See *Judson Mills*, *supra*.

A peculiarity of the agreement under consideration is that all of the 62 pieces of equipment were not delivered thereunder at one time, but were delivered at various times after the agreement was executed on March 6, 1941, up to and including December. The Government "recaptured" items from time to time in 1942, up to and including July. In that situation, the final lump sum payments varied in amount and in the ratio of each one to the value of the equipment. In other words, the agreement operated as to each item during varying periods of time. But regarding the entire operation of the contract as of December 31, 1941, the Government had a considerable, even though varying, equity in each of the 62 pieces of equipment, and at the end of 1941 the parties regarded the monthly payments as representing equity in each item. We must deal with this unique contract as it was intended to operate, and weigh the unusual features in accordance with what the evidence shows to have been the purpose of the entire agreement, with its supplements.

Furthermore, because of the practical phases of the operations under the agreement, i. e., the moving of items from time to time, and the

different dates of delivery of items to the Hoosier Ordnance Plant, the agreement could not have a stated term. It is obvious, however, that it contained terminal features, because the value of each item and the amount of each monthly payment were agreed upon, and the contract would end, with respect to a single item, at the latest, when the monthly payments equaled value. The facts with respect to the value and the amounts of each monthly payment show that the parties intended that the agreement was to extend over a short period of 6 to 15 months. The agreement resembled, therefore, the type of agreements where monthly payments are to be made for a stated period, and at the end of that period a small additional payment is to be made to acquire title. See, for example, the following cases where the period of the agreement was for a stated number of months or years, and at the end of the period, if monthly payments were not in default, the "lessee" could acquire title to property upon payment of a small additional amount: *Holeproof Hosiery Co., supra;* and *Judson Mills, supra,* where the contracts were held to be something other than an ordinary lease, the holding as to the nature of the monthly payments being that they were *not* rent for purposes of the income tax. See, also, *Helser Machine & Marine Works, Inc., supra.*

If the agreement were to be construed as a lease, and the final payments were to be regarded as the "purchase" price, the result would be that the partnership sold each one of the 62 items in 1942 at a loss, because in every instance the final payment was less than cost to the partnership, less depreciation. The evidence shows that the partnership had need for the equipment in question and, in fact, had to go out on the market to purchase equipment. To take the view that the partnership would have entered into a contract under which it might sustain losses upon sales would be an unreasonable one. There was a demand for equipment at the time, and sales could be made at a profit.

On the other hand, construing the agreement to be a conditional sales contract, the partnership realized a gain of about $150,900 on the sale of the 62 items.

Section 23 (a) (1) (A) of the Internal Revenue Code defines rent as payment for the use or possession of property. It excludes from the term "rent," payments for the use or possession of property to which the taxpayer is taking title, or in which he has equity. Under the facts in this proceeding, the Government was acquiring something of value under the payments and, since it was called "equity" under the agreements, and the agreements gave the Government the right to take title; the contract payments of 1941, involved in this proceeding, do not come within the definition of "rent" in section

23 (a) (1) (A) of the code. It is concluded that the payments were not rent, and, therefore, are not taxable as ordinary income.

While this proceeding was pending in this Court, and after the briefs were filed, *Estate of Clarence B. Eaton*, 10 T. C. 869, was decided. Under issue No. 2 in that proceeding (pp. 874 and 880–883), the question was whether amounts received by the taxpayer in 1942, under a fixed fee construction contract with the Government which contained a provision which was the same as the pertinent one in this proceeding, constituted ordinary income. The facts were stipulated, and a copy of the fixed fee construction contract was introduced in evidence. The contract, C. P. F. F. Form No. 1, was an entirely different form of contract than the one which is involved in this proceeding, which is Form 40–2111. However, in clause 2 of the contract was a provision for the rental of the constructor's equipment, and it contained the same kind of clause as is involved in this proceeding. In the *Eaton* case, the parties stipulated that certain payments made by the Government were "for the use" of items of equipment and machinery, and upon consideration of the evidence and the contract there involved, we concluded that the "rentals" were "not an element of the purchase price" and "were not 'applied' to that price, but, on the contrary, were expressly excluded from it." Also, in the *Eaton* case, the respondent argued that the Government "was not interested in acquiring equipment," so that the transfer of the equipment and the payments lost "their character as elements of a sale transaction."

Comparison of the facts in this proceeding and of the contract involved, Form 40–2111, with the facts found in the *Eaton* case brings out several important factual differences in this case, as follows: (1) There is testimony of the head of an equipment department for the Army engineers that the Government wanted to acquire certain types of equipment (of the kind involved in this proceeding), and orders had been issued from Washington to the field to "recapture" such equipment, and, to that end, to put the "recapture" clause in all contracts; and that the Government policy was that if payments under a contract equaled the value fixed at the time equipment was furnished, the Government should own the equipment upon paying the agreed value. (2) The value of each piece of equipment was agreed to in the contract and in supplements to the contract when equipment was delivered, and the accrued payments under the contract were entered in the supplemental contracts as the Government's "Equity"; and in the purchase orders the payments previously made were designated "equity." (3) The parties have stipulated that the total price paid by the Government for an item of equipment was the sum of the contract value of an item, the 1 per cent increment, and freight; and that, when the Government acquired title to the equipment in 1942, the

"rent" payments were treated "as the Government's equity applied on the price paid by the Government." (4) The monthly payments agreed upon were in such amounts that the payments thereof over a period of from 6 to 10 or 12 months would equal the contract value, or purchase price, of the item. (5) The final payments by the Government for one-third of all of the items of equipment were small in amount compared to the value of the items.

Such facts, as above referred to, were *not* found in the *Eaton* case and, lacking them, it was reasonable to conclude that it was the intent of the parties to the contract in that case that machinery and equipment were being *rented*. The petitioner in that case stipulated that the payments involved were "for the use" of equipment, which signifies that the parties intended that the payments were rent, and this stipulation was regarded by this Court as highly determinative of the question presented. See p. 880. In this case, we have a different form of contract, in which monthly payments were entered as the Government's "equity," and a stipulation that the payments were applied to the total price. In view of the differences in the contracts, the intent of the parties, the facts as shown by the records, the exhibits, and the stipulations in the two proceedings, this proceeding is distinguishable from the *Eaton* case.

In the consideration of the issue presented, review has been made of practically all of the decisions by this Court in cases where the general question was whether payments constituted rent or payments of purchase price under some form of sale agreement, and attention has been given, in particular to the following: *Goldfields of America, Ltd.*, 44 B. T. A. 200; *Rotorite Corporation*, 40 B. T. A. 1304; reversed, 117 Fed. (2d) 245; *Gilken Corporation*, 10 T. C. 445; *Indian Creek Coal & Coke Co.*, 23 B. T. A. 950. The holdings in such cases are not apposite to the facts and the contract involved in this proceeding.

Petitioner relies chiefly upon the *rationale* of *Virginia Iron Coal & Coke Co.*, 37 B. T. A. 195; affd., 99 Fed. (2d) 919. In our opinion, it is unnecessary to consider the applicability of the reasoning of that case to the question presented, in view of the character of the contract we have here, and the facts.

It is concluded that the agreement in this proceeding was in the nature of a conditional sales contract, upon the record before us, and under the authorities which are cited above. It is held that the payments under the contract which the partnership accrued in 1941 were not rents, but were payments on purchase price. Respondent's alternative contention is rejected.

A further question remains which is disposed of briefly. Respondent originally determined that the partnership realized in 1941 a proportionate part of the entire profit from the disposition of the

equipment under bills of sale in 1942, and increased the partnership income by $66,692.36. He made this determination by applying to the partnership a ruling in I. T. 3533, C. B. 1942–1, p. 87. He determined that $66,692.36 represented "the percentage of profit realized under the contract with respect to the payments received in the year 1941."

We have considered the above ruling, as amended by I. T. 3631, C. B. 1943, p. 197. The method set forth in I. T. 3533, *supra*, permits a taxpayer to treat a contract of the kind involved as a contract to sell property on the installment plan, and appears to approve interpretation of the contract as one where title is to remain in the vendor until the purchaser has performed his part of the transaction. The ruling is permissive. It appears that it allows a taxpayer to have the benefits of section 44 (b) of the Internal Revenue Code, which applies to casual sales of personalty. But the ruling does not deal with the alternative method or methods of reporting income under such type of contract where the taxpayer does not elect to use the permitted method.

The partnership did not elect to accept the "privilege" of reporting income from the contract under I. T. 3533. The Commissioner can not compel the partnership to make an election which it does not choose to make. The installment method of accounting is optional. Indeed, the binding effect of making an election, and the problems inherent in changing from the installment basis to the accrual basis under the Commissioner's regulations, suggest that the taxpayer must be free to chart his own course. See also Regulations 111, section 29.44–1, p. 270, where it is said:

If the vendor chooses as a matter of consistent practice to return income from installment sales on the straight accrual or cash receipts and disbursements basis, such course is permissible.

Respondent erred in increasing the partnership income for 1941 with respect to the payments under the agreements in question, and in increasing petitioner's share of the partnership income.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

VAN FOSSAN, *J.*, dissents.

MURDOCK, *J.*, dissenting: I do not think this case is distinguishable from *Estate of Clarence B. Eaton*, 10 T. C. 869.

JOHNSON, *J.*, dissenting: In holding that payments received from the Government on account of equipment constituted selling price under a conditional sale agreement and not rent as recited in the contract, the majority imputes to the Government a fixed intention to buy

the equipment when the contract was made and relies on decisions in which similar contracts between individuals and corporations have been so construed. In my opinion the. motives of financial caution which might influence. private parties to incorporate lease terms or "recapture" clauses in contracts really intended to effect sales can not be rationally imputed to the United States Government. It requires no "easy payment plans," no credit extensions, no safeguards against future financial straits. If it had harbored a fixed intention of purchasing the equipment when the contract was made, it would have bought it then for cash. Since it did not do so, the conclusion seems inescapable that it had no fixed intention to buy at that time and meant to rent, as it purported to do. In *Estate of Clarence B. Eaton*, 10 T. C. 869, this Court treated similar payments as rent under a Government contract that, as the majority here expressly states, "contained a provision which is the same as the pertinent one in this proceeding." I perceive no material respect in which the facts here shown differ from those considered there, and the majority's conclusion in this case seems to me in direct conflict with the Court's prior holding.

TURNER, LEECH, DISNEY, and OPPER, *JJ*., agree with this dissent.