Herman B. Meiselman and Claire Meiselman, et al. [1] v. Commissioner. Meiselman v. Commissioner
Docket Nos. 70684-70687.
United States Tax Court
T.C. Memo 1961-90; 1961 Tax Ct. Memo LEXIS 260; 20 T.C.M. (CCH) 405; T.C.M. (RIA) 61090; March 30, 1961
*260 F. A. McCleneghan, Esq., and F. T. Miller, Jr., Esq., 700 Law Bldg., Charlotte, N.C., for the petitioners. Wallace M. Wright, Esq., for the respondent. TRAIN
Memorandum Findings of Fact and Opinion TRAIN, Judge: Respondent determined deficiencies in the income taxes of the petitioners for the year 1953 as follows: H. B. Meiselman and Claire Meiselman
Docket No. 70684
Additions to Tax
Sec. 294
Sec. 294
Deficiency
(d)(1)(A)
(d)(2)
$35,896.04
$3,173.69
$2,115.80
General Realty and Management, Inc.
Docket No. 70685
22,010.69
Brash Realty Company, Inc.
Docket No. 70686
4,680.00
LeLux Theatres, Inc.
Docket No. 70687
10,641.29
The issues to be decided are: (1) Whether amounts received by the petitioners on the disposition of theatre equipment represented receipts from the sale of capital assets or rentals pursuant to a lease and if the disposition of the equipment was a sale, what was its basis in the hands of the petitioners; and (2) Whether the face amount of notes given as part of the purchase price of certain equipment is includible in income in 1953. Findings of Fact Petitioners, Herman *261 B. Meiselman (hereinafter called Meiselman) and Claire Meiselman, are husband and wife. During the taxable year 1953, they resided in Charlotte, North Carolina, and filed a joint income tax return with the district director of internal revenue, Greensboro, North Carolina. Petitioners, individually, did business in the partnership name of H. B. Meiselman Theatres. The partnership filed a U.S. Partnership Return of Income, form 1065, for the calendar year 1953 with the district director of internal revenue, Greensboro, North Carolina. Petitioner, General Realty and Management, Inc., (hereinafter called General Realty) is a North Carolina corporation with its principal place of business in Charlotte, North Carolina. For the calendar year 1953, General Realty filed a corporate income tax return with the district director of internal revenue, Greensboro, North Carolina. Petitioner, Brash Realty Company, Inc. (hereinafter called Brash Realty) is a North Carolina corporation with its principal place of business in Charlotte, North Carolina. For the calendar year 1953, Brash Realty filed a corporate income tax return with the district director of internal revenue, Greensboro, North Carolina. *262 Petitioner, DeLux Theatres, Inc., (hereinafter called DeLux) is a North Carolina corporation with its principal place of business in Charlotte, North Carolina. For the calendar year 1953, DeLux filed a corporate income tax return with the district director of internal revenue, Greensboro, North Carolina. Petitioners are, and have for several years, engaged in the operation of motion picture theatres. The three corporate petitioners are controlled by the individual petitioners, Meiselman and wife, who together with members of their family own all the outstanding stock of all these corporations. Meiselman and wife, as officers and members of the board of directors of the corporate petitioners, direct and manage the corporate affairs. By contract dated July 25, 1953, and amended July 29, 1953, the petitioners agreed to lease and did lease to Stellings-Gossett Theatres, Inc., (hereinafter referred to as Stellings-Gossett) certain real properties owned by or under lease to petitioners. The contract also provided for the sale to Stellings-Gossett of certain equipment located in the theatres leased to it. However, the intent of the parties was to lease the equipment rather than consummate *263 a sale. As amended, the pertinent parts of that contract are as follows: THIS LEASE AGREEMENT made and entered into this 25th day of July, 1953, by and between DE LUX THEATRES, INC., a corporation chartered under the laws of the State of North Carolina, with an office and place of business in Charlotte, North Carolina, BRASH REALTY COMPANY, INC., a corporation chartered under the laws of the State of North Carolina, with an office and place of business in Charlotte, North Carolina, CENTER THEATRE BUILDING, INC., a corporation chartered under the laws of the State of North Carolina, with an office and place of business in Charlotte, North Carolina, GENERAL REALTY & MANAGEMENT, INC., a corporation chartered under the laws of the State of North Carolina, with an office and place of business in Charlotte, North Carolina and H. B. MEISELMAN and wife CLAIRE MEISELMAN, hereinafter referred to as the Landlords, and STELLINGS-GOSSET THEATRES, INC., a corporation chartered under the laws of the State of North Carolina, with its principal office and place of business in Charlotte, North Carolina, hereinafter referred to as the Tenants: WITNESSETH: That the Landlords, for and in consideration *264 of the covenants hereinafter contained, do hereby for themselves, their successors, assigns, heirs, next of kin, executors and administrators hereby rent, lease and demise unto the aforesaid Tenant, its successors and assigns, for the periods of time hereinafter set forth and upon the terms and conditions hereinafter set forth the properties as follows: (1) The Strand Theatre in Rockingham, North Carolina, the same being owned by the Delux Theatres, Inc., * * * (2) The Raleigh Road Drive-In Theatre in Cumberland County, North Carolina near Fayetteville, North Carolina, the same being owned by the Brash Realty Company, Inc., * * * (3) The Center Theatre in Charlotte, North Carolina, the same being owned by Center Theatre Building, Inc., and being a portion of the property described in the deed to Center Theatre Building, Inc. by H. B. Meiselman and wife dated November 26, 1946, * * * (4) The Flamingo Drive-In Theatre in Scotland County, North Carolina, near Laurinburg, North Carolina, the same being owned by the DeLux Theatres, Inc; * * * (5) The Park Theatre, in Kinston, North Carolina, * * * the same being owned by Moses L. Stadiem and others and being the property leased *265 by the said Moses L. Stadiem and others to General Realty & Management, Inc. * * * (6) The Manor Theatre in Wilmington, North Carolina, * * * the same being owned by Mannie N. Bear and husband B. I. Bear and having been leased by them to H. B. Meiselman, by lease agreement dated December 5, 1941. * * * (7) The Strand Theatre in Waynesville, North Carolina, * * * the same being owned by Charles F. Owen, Jr. and wife Eloise Owen and leased by them to H. B. Meiselman. * * *
(1) This lease as to the Strand Theatre in Rockingham shall be for a term of ten (10) years from August 1, 1953. The Tenant agrees to pay a monthly rental in advance of One Hundred Fifty ($150.00) Dollars. In addition to this the Tenant agrees to pay immediately the sum of Thirty-Two Thousand Five Hundred ($32,500.00) Dollars for the equipment and apparatus used in connection with the said theatre. [As amended, the contract provided: "(1) The price for the equipment and apparatus used in connection with the Strand Theatre in Rockingham shall be and hereby is agreed to be $17,500.00. Of this amount $5,000.00 shall be paid by the tenant immediately. The parties of the first part acknowledge the receipt of *266 this cash payment. The remaining $12,500.00 shall be paid in twenty equal quarterly installments beginning January 10, 1954 and on the 10th day of each April, July, October and January thereafter until the same shall have been completely paid, except that on the demand of the landlords, two payments shall be made on January 10, 1954."] (2) This lease as to the Raleigh Road Drive-In Theatre, at Fayetteville shall be for a term of seven (7) years from August 1, 1953. The Tenant agrees to pay a weekly rental in advance of Three Hundred ($300.00) Dollars. The Tenant agrees to pay the sum of Fifteen Thousand Six Hundred ($15,600.00) Dollars immediately, in advance. This $15,600.00 shall be security for the rental for the seventh or last year of the said term. (3) This lease as to the Center Theatre in Charlotte, shall be for a term of ten (10) years from August 1, 1953. The Tenant agrees to pay a monthly rental in advance of Six Hundred Fifty ($650.00) Dollars or ten (10%) per cent of the gross receipts from motion picture theatre admissions, whichever sum is the greater, such gross receipts being the amount received for such admissions, less any admission taxes paid to the State, *267 Federal or other Governments, under present or future laws. * * *
In addition to the above amounts the Tenant agrees to pay the sum of Fifty Thousand ($50,000.00) Dollars for the equipment and apparatus, used in connection with the said theatre. Thirteen Thousand Two Hundred Fifty ($13,250.00) Dollars of this amount shall be paid by the Tenant immediately. The remaining Thirty-Six Thousand Seven Hundred Fifty ($36,750.00) Dollars shall be paid in twenty (20) equal quarterly installments beginning January 10, 1954 and on the tenth day of each April, July, October and January thereafter until the same shall have been completely paid, except that on the demand of the Landlord two payments shall be made on January 10, 1954. [As amended, the contract provided: "(3) The price for the equipment and apparatus used in connection with the Center Theatre in Charlotte shall be and hereby is agreed to be $57,500.00. Of this amount $47,500.00 shall be paid by the tenant immediately. The parties of the first part acknowledge the receipt of this cash payment. The remaining $10,000.00 shall be paid in twenty equal quarterly installments beginning January 10, 1954 and on the 10th day of each *268 April, July, October and January thereafter until the same shall have been completely paid, except that on the demand of the landlords, two payments shall be made on January 10, 1954."] (4) This lease as to the Flamingo Drive-In Theatre at Laurinburg shall be for a term of five (5) years from August 1, 1953. The Tenant agrees to pay a weekly rental in advance of Two Hundred ($200.00) Dollars. The Tenant agrees to pay the sum of Ten Thousand Four Hundred ($10,400.00) Dollars immediately, in advance. This $10,400.00 shall be security for the rental for the fifth or last year of the said term. (5) This lease as to the Park Theatre in Kinston shall be for a term of eight (8) years from August 1, 1953. The Tenant agrees to pay a monthly rental in advance of Eight Hundred ($800.00) Dollars. In addition to this the Tenant agrees to pay immediately the sum of Fifty Thousand ($50,000.00) Dollars for the equipment and apparatus used in connection with the said theatre. [As amended, the contract provided: "(5) The price for the equipment and apparatus used in connection with the Park Theatre in Kinston shall be and hereby is agreed to be $50,000.00. Of this amount $9,000.00 shall be paid *269 by the tenant immediately. The parties of the first part acknowledge the receipt of this cash payment. The remaining $41,000.00 shall be paid in twenty equal quarterly installments beginning January 10, 1954 and on the 10th day of each April, July, October and January thereafter until the same shall have been completely paid, except that on the demand of the landlords, two payments shall be made on January 10, 1954."] (6) This lease as to the Manor Theatre in Wilmington, shall be for a term of eight (8) years from August 1, 1953. In the event that the Landlords or any one of them acquires the ownership of this property, at any time prior to the expiration of the said eight year term, it is agreed that the term shall be extended for two years, so that the term herein provided for will be for ten (10) years instead of eight years. The Tenant agrees to pay a monthly rental in advance of Five Hundred Fifty ($550.00) Dollars. In addition to the above monthly rental the Tenant agrees to pay the sum of Fifty Thousand ($50,000.00) Dollars for the equipment and apparatus used in connection with the said theatre. Thirteen Thousand Two Hundred Fifty ($13,250.00) Dollars of this amount shall *270 be paid by the Tenant immediately. The remaining Thirty Six Thousand Seven Hundred Fifty ($36,750.00) Dollars shall be paid in twenty (20) equal quarterly installments beginning January 10, 1954, and on the tenth day of each April, July, October and January thereafter until the same shall have been completely paid, except that on the demand of the Landlord two payments shall be made January 10, 1954. [As amended, the contract provided: "(6) The price for the equipment and apparatus used in connection with the Manor Theatre in Wilmington shall be and hereby is agreed to be $57,500.00. Of this amount $47,500.00 shall be paid by the tenant immediately. The parties of the first part acknowledge the receipt of this cash payment. The remaining $10,000.00 shall be paid in twenty equal quarterly installments beginning January 10, 1954 and on the 10th day of each April, July, October and January thereafter until the same shall have been completely paid, except that on the demand of the landlords, two payments shall be made on January 10, 1954."] (7) This lease as to the Strand Theatre in Waynesville shall be for a term of four and a half (4 1/2) years from August 1, 1953. It shall be up *271 to five (5) years, to the extent that this is in the lease referred to in paragraph seven above. The Tenant agrees to pay a monthly rental in advance of Three Hundred ($300.00) Dollars or twelve (12%) per cent of the gross receipts from motion picture theatre admissions, whichever sum is the greater, such gross receipts being the amount received for such admissions, less the admission taxes paid to the State, Federal or other Governments, under present or future laws. * * * It is expressly understood that should the 12% be greater than the monthly minimum rental herein provided for, the said minimum monthly rental shall be applied as a credit upon the total amount due for the particular month. Any payment of overage that may be due, shall be due and payable, on the 10th of the subsequent month. * * *
In addition to the above amounts the Tenant agrees to pay the sum of Fifteen Thousand ($15,000.00) Dollars for the equipment and apparatus used in connection with the said theatre, the same to be paid immediately. (8) It is expressly understood that the payments hereinabove referred to, other than the monthly rental payments and the security for the advance rent being paid on *272 the theatres at Fayetteville and Laurinburg, - covers and represents the purchase price of the equipment and apparatus, located at the various theatres. It also includes the interest of the Landlord in any and all improvements and other property added to the premises, in connection with the adaptation of the same for theatre purposes, as distinguished from the ownership of the real estate itself. At the end of each term, the Landlord owning the particular property, or leasehold, shall have the option to buy back from the Tenant this equipment and apparatus and other leasehold improvements, referred to in this paragraph, for the sum of One Hundred ($100.00) Dollars, with respect to each such theatre location, it being understood and agreed that by the end of the respective terms, such equipment, apparatus and other property of the Landlords, hereby being sold to and purchased by the Tenant, will be fully depreciated, and virtually of no value. However, this option shall not apply to the equipment and apparatus at the Strand Theatre in Waynesville. (9) All fuel oil and supplies including inventory of candy, popcorn and other concessions, on the premises on August 1, 1953, to be taken *273 over by the Tenant, shall be paid for by the Tenant at their present inventory cost prices. All operation license taxes, heretofore paid or payable, shall be pro rated, and paid by the respective parties, as of August 1, 1953. * * *
(11) The Landlords and each of them agree that if at the end of any particular term hereinabove referred to, it or he shall not desire to operate the particular theatre itself or himself or to have the same operated by a member of the family of Mr. H. B. Meiselman or by some corporation, which he or his family own or control, and if the particular Landlord desires to lease the said property to others, the Tenant herein named shall be given the first refusal upon a new lease, covering the particular theatre, in each instance, before the same is offered to others on such terms, so offered to this Tenant. (12) With respect to any theatre covered by this lease, if the same should be damaged or destroyed by fire, the Landlord agrees to promptly repair or restore the same. If the property as a result of such fire or casualty shall be unfit for use by the Tenant for as much as twenty (20) days, the rent herein provided for to be paid for the said premises *274 shall abate and be suspended for a period from the date of the damages to the premises, until the date when the said premises are so repaired or restored, so as to be fit and ready for occupancy by the Tenant, as the same existed, prior to the fire or other casualty. The Landlords agree to take out, carry and provide or cause to be taken out, carried and provided adequate insurance against such fire and the other elements on the aforesaid buildings including any and all improvements made to them and including the equipment and apparatus being sold to the Tenant at this time, the same being subject to the right of the Landlord to buy the same back at the end of each respective term for the $100.00 hereinabove referred to. This insurance shall be in an amount equal to at least eighty (80%) per cent of the replacement cost of the said properties, from time to time. The insurance shall be payable to the particular Landlord, owning or having an interest in the said location and property and to the Tenant herein, as their interest may appear. The proceeds derived from such insurance companies, as a result of any such fire or other similar damage are to be used in connection with the replacement *275 of the said building immediately or the carrying out of the obligations of the Landlord to the Tenant, herein provided for. In the event of a fire or other casualty of such nature at any of the theatres hereby leased, in addition to any and all other rights on the part of the Tenant herein-above referred to, it shall have the right to repair and restore the said theatre, and to deduct the cost of so doing, if the said Tenant elects and decides so to do, from the future rentals in connection with any and all of the properties hereby leased to the Tenant. * * *
(14) The Tenant agrees to maintain the interior of the aforesaid theatres and the equipment used in connection with the same, during the aforesaid terms in reasonably good condition, - consequences of fire, other casualty, acts of God, unavoidable accidents, ordinary wear and tear and depreciation, being hereby excepted. The Tenant likewise agrees to procure and pay for a reasonable amount of liability insurance, so as to protect the Tenant from legal liability to the public, and to preserve the name and good will of the said theatres. As set forth in the above contract, the total "purchase price" of the equipment located *276 in the Center, Manor, Strand (Rockingham), and Park Theatres was $182,500. Of this amount, $109,000 was to be paid in 1953, and the balance was evidenced by unsecured, non-interest bearing notes. When these notes were issued to the petitioner, they were only evidences of the obligations and had no fair market value. A common method of valuing a theatre location is to take the average net income of the theatre before taxes for the previous three years and then multiply that average by three. However, the "purchase price" of the equipment in the several theatres involved here was not allocated to the theatres on the basis of earnings nor did the "purchase price" bear any reasonable relation to the value of the equipment, in an operating theatre, as estimated by Meiselman. The following schedule shows, in the case of each of the theatres, the average age of the equipment, the cost basis of that equipment before depreciation, the depreciated value, Meiselman's own estimate of the value of that equipment as part of an operating theatre, the value of the theatre determined on the basis of the three-year average earnings method set forth above, and the actual "purchase price" of the equipment *277 as allocated by the contract: Average Age
of Equip-
Depreciated
Theatre
ment
Cost
Value
Strand, Rockingham
11
$ 557.09
$ 439.44
Center
6
29,797.78
12,648.85
Park
2
39,080.74
30,171.99
Manor
12
32,202.82
7,181.67
Estimated Value
3-Year Aver-
Purchase
in Operating
age Earn-
Price of
Theatre
Theatre
ings X 3
Equipment
Strand, Rockingham
$ 7,000-$ 8,000
$45,445.41
$17,500
Center
20,000-30,000
39,997.80
57,500
Park
41,000-42,000
35,917.77
50,000
Manor
15,000-18,000
70,609.68
57,500
Opinion Petitioner, Brash Realty, has conceded that $15,600 received in 1953, as a security deposit for subsequent years' rent, was properly included in income in the taxable year 1953. In 1953, DeLux also received $10,400 as a security deposit for subsequent years' rent, and has conceded that the amount of this deposit was properly included in its income in the taxable year 1953. Respondent has conceded that there are no additions to the tax due from the petitioners under the provisions of section 294(d)(2). Issue 1. The question of whether a particular transaction is a sale or a lease is a question *278 of substance and not form. The courts will always look to its purpose, rather than to the name given it by the parties. Truman Bowen, 12 T.C. 446 (1949). Substance is governed by the intent of the parties, Hervey, et al v. R. I. Locomotive Works, 93 U.S. 664 (1876), Heryford v. Davis, 102 U.S. 235 (1880), and intent is to be determined from all the circumstances surrounding the transaction. The distinction between an ordinary lease and a conditional sale is well-established. A lease contemplates only the use of the property for a limited time and the return of it to the lessor at the expiration of that time; whereas, a conditional sale contemplates the ultimate ownership of the property by the buyer, together with the use of it in the meantime. Truman Bowen, supra. The evidence clearly indicates, and we have so found, that Stellings-Gossett intended to lease all of petitioners' theatres as operating businesses, rather than leasing the buildings and buying the equipment. Meiselman and Stellings testified that, generally, the value of a particular theatre location is determined by taking the net income before taxes for the *279 previous three years and then multiplying the average of those years by three. Of course, such a method of valuation has little relation to the actual value of equipment aside from its use as part of a going concern. However, as shown by the table set forth in our findings, the "purchase price" was not, in fact, allocated to the theatres on the basis of earnings as Meiselman testified, nor does it appear that it had any reasonable relation to the value of the equipment, in an operating theatre, based on Meiselman's own estimates. The contract provided that at the end of the leases on the buildings, petitioners would have the option to repurchase from Stellings-Gossett, the equipment and apparatus and other leasehold improvements for the sum of $100, with respect to each theatre location. Stellings testified that he insisted on that clause being in the agreement so that Stellings-Gossett would not have the expense at the expiration of the lease of removing the equipment. He indicated that he did not want to have the liability of removing the equipment because it costs almost as much to remove it as it does to put it in. That reason may explain why such a reservation was made, but *280 it does not detract from the conclusion that petitioners did not dispose of all their substantial interest in the equipment by reason of this option. That Stellings-Gossett only wanted the "use" of the equipment as part of operating businesses rather than the "ownership" of it is borne out by the following testimony of Stellings: Q Mr. Stellings, isn't it customary, and haven't you followed the practice of replacing the equipment in the theatres even though it will revert to Mr. Meiselman to the extent it will return a value to you during the term of the lease? A If we figure we will get our money out of the improvement, yes, during the remaining period of that lease, yes. Meiselman did not want to give up the ownership and control of the equipment because he did not want Stellings-Gossett to destroy his properties by attempting its removal. The conclusion is inescapable that Stellings-Gossett was going to use the equipment for the period of the building lease and then the equipment was to revert to petitioners. In view of the testimony of Stellings and Meiselman, there was little if any possibility that petitioners would fail to exercise their option; thus Stellings-Gossett *281 got no more than if the agreement had been called a lease. However, even assuming petitioners declined to exercise the option, it would be improbable that Stellings-Gossett would go to the expense of removing the equipment, when they could merely abandon it, there being no condition in the agreement requiring them to remove it. Nor does it seem likely that petitioners would force Stellings-Gossett to remove it in light of Meiselman's testimony. Another indication that the contract was a lease is the fact that petitioners were obligated by the agreement to carry insurance not only on the buildings but on the equipment as well. Meiselman testified that this was done to protect his interest in the equipment. Also, the agreement specified that any insurance proceeds would be paid to the landlord and tenant "as their interests may appear". Nonetheless, the obligation was there, and it is indicative of a lease covenant, especially since the equipment would supposedly be paid for in five years, while most of the leases extended several years past that time. Thus, petitioners would have been carrying insurance on property after they had no further interest in it if this were a sale as alleged. *282 The remainder of the "purchase price" of the equipment was evidenced by unsecured, non-interest bearing notes. Generally, where there is a sale, the property is secured by a mortgage and notes given as part of the "purchase price" provide for interest. The inference is that unsecured, non-interest bearing notes are rental payments rather than purchase money. The relationship of lessor and lessee is also apparent in the requirement that Stellings-Gossett maintain the equipment, which it had purportedly purchased, in good operating condition. The compelling inference is that petitioners desired to protect the values of equipment in which they had an interest. In requiring that the equipment be so maintained, petitioners protected a continuing interest in the property in a capacity identical with that of lessor. In Minneapolis Syndicate, 13 B.T.A. 1303 (1928) we had a similar situation before us. In that case, the petitioners leased land for 130 years and purportedly sold a building on the land. In that case we stated: "What is the ultimate interest received by the grantees under this deed? It purports to convey to them an unrestricted, fee simple title to the building, *283 but the conditions of the lease of the land, which by the rule of construction noted are considered as embodied in it, impose definite and specific restrictions in respect to the building which are inconsistent with the ownership of a fee simple estate, by obligating them to keep the building insured for its full insurable value, to keep it in repair, to give bond to petitioner before making structural changes or repairs which necessitate the demolition of a portion of the building, and finally requiring them to return the lot at the end of the lease period with these improvements as maintained, or similar ones of a value of not less than $500,000. These restrictions reserve to the grantor a reversionary interest in the building itself in addition to the land and it can not be said, in our opinion, that the effect of the transaction was to divest petitioner of all interest in the building and leave it with $250,000 representing that interest. "The form of the conveyance of the building is that of a warranty deed, but the reservations noted result in the grantees taking no greater beneficial interest in that property than they would had the instrument been a lease for 130 years. The *284 form of the conveyance does not determine the interest taken. * * *" Petitioners have attempted to distinguish the Minneapolis Syndicate, supra, from their case. They point out that there was an automatic reversion in that case. They also point out that the requirement in the instant contract that the equipment be maintained in "reasonably good condition" was modified by an exception as to "ordinary wear and tear and depreciation." As a matter of fact, they contend that the equipment would be "fully depreciative, and virtually of no value" at the time the option to repurchase would become exercisable. As to the insurance, petitioners contend that it was easier to procure a package policy and since the equipment was to be paid for over a number of years, it was also to protect their interest in the equipment. We see no merit in the distinctions made by petitioners for reasons heretofore set out in this opinion. Other than the label "sale" that has been attached to that part of the contract involving the equipment, all other circumstances indicate that a lease and not a sale was intended. The purpose of Stellings-Gossett in entering into the agreement was to secure, *285 for a period of years, the rights to possession and control of the theatres as operating concerns. The transaction was considered to be a "key job"; that is, each business was fully equipped and operating. The equipment, without a lease on the building in which it was installed, was relatively valueless. In fact, Stellings testified that he would not go out and purchase equipment in a closed theatre just to buy the equipment. It was intended that the ownership of the equipment, in place, would be assumed by petitioners at the end of the lease periods and that Stellings-Gossett would not be burdened with the incidents of ownership after that time. Consequently, the rights sought and acquired by Stellings-Gossett were effectively terminated upon the expiration of their rights to occupy the theatre buildings under their leases. A given result at the end of a straight path is not made a different result because reached by following a devious path. Griffiths v. Helvering, 308 U.S. 355 (1939). We hold that the equipment was leased rather than sold to Stellings-Gossett. Issue 2. The remaining question to be decided is whether the face amount of the notes, representing the *286 balance of the purported purchase price of the equipment in the Center, Manor, Strand (Rockingham), and Park theatres, should be included in income in the year 1953. The notes were unsecured and non-interest bearing, payable quarterly in 20 payments. Meiselman testified that he had tried to discount these notes at two banks a short time after their issuance, and both refused. It is also to be noted that Stellings-Gossett was a new company. Under similar facts, we held in Jay A. Williams, 28 T.C. 1000 (1957), acq. 1958-1 C.B. 6, that the notes had no fair market value and consequently the notes themselves could not be held the equivalent of cash during the year of their receipt. We have found that the notes involved here likewise had no fair market value, and we hold, therefore, that they were not the equivalent of cash in the year of their receipt. The actual payments under the notes would be includible when received. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: General Realty and Management, Inc., Docket No. 70685; Brash Realty Company, Inc., Docket No. 70686; DeLux Theatres, Inc., Docket No. 70687.↩