W. H. Hughes v. Commissioner.
W. H. Hughes v. Commissioner
Docket Nos. 21328, 35635.
United States Tax Court
1952 Tax Ct. Memo LEXIS 121; 11 T.C.M. (CCH) 797; T.C.M. (RIA) 52240; July 31, 1952
James J. Dougherty, Esq., for the petitioner. Charles J. Hickey, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: Respondent determined deficiencies in income and victory tax for the year 1943 and income tax for the years 1944 through 1946 as follows: Docket No.
Year
Deficiency
21328
1943
$7,000.89
35635
1944
3,093.81
1945
1,668.83
1946
869.81
The respondent, by an amended answer filed on November 30, 1950, determined an increased deficiency for *122 the taxable year 1943 from $7,000.89, as set forth in the deficiency notice, to the amount of $11,266.40. Respondent's amended answer alleges that an additional $7,400 as interest income was properly includible in petitioner's net income for 1943. However, on brief, respondent's determination as to this $7,400 for 1943 was waived. Petitioner alleged that the respondent erroneously disallowed a capital loss deduction in 1942 in the amount of $50,000. However, at the hearing, petitioner specifically waived this allegation of error. The deficiency for 1943 depended in part upon certain adjustments made in the net income for 1942. The following issues are presented in these consolidated proceedings: (1) Were certain sums received by the petitioner during the years 1943 through 1946 taxable as rental income, or as a return of capital? (2) The second issue is divided into two sub-issues: (a) What is the tax liability for certain sums which were payable to the petitioner as a beneficiary under a trust, but which were garnisheed as a result of a note maker's failure to pay these notes? (b) Is petitioner entitled to deductions for the payments made as guarantor on default of these *123 notes? (3) Were certain sums received by the petitioner from the corporation in 1942 and 1943 taxable as interest income? (4) Has respondent properly increased the petitioner's compensation for the year 1943 by an adjustment of $1,000? Findings of Fact Some of the facts are stipulated and are so found. Petitioner, an individual, a resident of Pennsylvania, has his principal office in Cresson, Cambria County, Pennsylvania. He filed his returns for the years involved with the collector of internal revenue for the first district of Pennsylvania, at Philadelphia. Issue 1 Petitioner as an individual owned and operated his own coal mines. On October 29, 1918, petitioner entered into an agreement with two other individuals and the Forks Coal Mining Company, a Pennsylvania corporation (hereinafter sometimes referred to as the corporation). The agreement, in part, is as follows: "The party of the second part [petitioner] covenants and agrees to purchase or pay for the installation (with his own personal funds) of the necessary mine machinery, equipment, fixtures, improvements and property, for such extension and development of the mines and mining property of the Forks Coal *124 Mining Company on its leasehold at South Fork, Cambria County, Pennsylvania, as may be reasonably required for the mining and preparing for market of the coal to be mined under said lease, his expenditures for such purposes, however, not to exceed the sum of Fifteen Thousand (15,000) Dollars; the purchase and installation of any such property and improvements, however, shall be with the concurrence and approval of Ray M. Schuster, so long as he, the said Ray M. Schuster, is a stockholder of the Company. The title of the property so purchased from time to time by the party of the second part shall be and remain vested in him, and he covenants and agrees to and does hereby lease the same to the said Company, so long as the said Company use the same in connection with the operation of its mines on the aforesaid leasehold, for the use of which equipment and property the Company will pay a monthly rental to the party of the second part equal to the net earnings of the said Company for each particular month, but which in no case shall be less than twenty-five (25) cents per net ton, for each and every net ton of coal mined by the said Company during each month, the said rental to be paid *125 monthly on or about the 20th day of each and every month; the Company, however, is hereby given the option or privilege to purchase said property and improvements at any time, upon payment to the party of the second part of the amount paid by him for the same, plus interest at the rate of six (6) per centum per annum, from which shall be deducted the aggregate amount of rental paid by the Company to the party of the second part. Should the Company exercise its option to purchase said property, the party of the second part will execute and deliver to it a Bill of Sale for the same; however, until the Company exercises its option to purchase the said property, it agrees to keep the same in good repair and condition, make all necessary repairs thereto and replace any article of machinery, or parts thereof, which may be worn out or destroyed." In accordance with the terms of this contract petitioner purchased and installed $15,000 worth of mining equipment. Later it was determined that additional equipment would be necessary to put the mine in proper running condition. The parties to the agreement of October 29, 1918, made a supplemental agreement. The terms of the supplemental agreement *126 were set forth in a letter dated May 22, 1919, and addressed to the petitioner. The letter, in part, is as follows: "Second - You shall immediately assume the full charge of the mining operations of the Forks Coal Mining Company, and the shipping of such coal as it shall mine. You shall arrange for the payment of all the present unpaid bills of the Forks Company. You shall rent to the Forks Company such additional equipment (in addition to the equipment amounting to about $15,000.00 in value, previously rented) as you will consider necessary for the successful operation of its mines. The Forks Coal Mining Company shall pay you a rental for the use of this equipment, the amount of rental to be paid from time to time to be determined by you from the financial condition of the Company at such times. The rental shall be paid you monthly, if practicable. At such time as the rentals paid for the use of this additional equipment shall equal the cost of the same to you, plus 6% interest, you shall transfer same to the Forks Coal Mining Company, with a bill of sale. You shall receive from the Forks Coal Mining Company 10" per net ton on all the coal mined by it from May 1st last, until the *127 cessation of its mining operations at South Fork, Pa. This 10" per ton shall, however, be charged against the items of rental which you receive for the equipment above referred to (not including sundry supplies) until such time as the Company receives from you the bill of sale referred to for said equipment. The Company shall pay any taxes which may be levied against its personal property, which you have rented to it for its use. "Third - There shall be no further salaries paid to either Mr. Schuster, yourself or the writer until all of the indebtedness of the Company has been paid off, and in no case until such period as we can unanimously agree upon, dependent upon the condition of the affairs of the Company." Petitioner purchased additional equipment so that an aggregate of $45,000 worth of equipment was placed on the property at South Fork. On July 15, 1920, the Forks Coal Mining Company, the corporation, was dissolved; the business was carried on from that date as a partnership known as the Forks Coal Company (hereinafter sometimes referred to as the partnership). Petitioner received a one-half interest in the partnership. The partnership agreement incorporated by reference *128 the agreement of May 22, 1919, and provided that this earlier agreement have "the same force and effect as if set forth herein verbatim" and "shall be the obligation of this partnership and will be fully performed in accordance with the terms thereof". By November 15, 1920, the first $45,000 worth of equipment which had been installed by petitioner was fully paid for, and petitioner then executed a bill of sale to the Forks Coal Company for this equipment. During the year 1920 petitioner equipped his own mine known as Hughes No. 1. However, within a year the vein of coal ran out and the mine was shut down. About this time the partnership leased a tract of coal land at Blandburg, Pa. Petitioner transferred all of the equipment from Hughes No. 1 to the Blandburg property, known as Hughes No. 11. This transfer was made during the earlier part of 1922 and the value of the equipment transferred was approximately $38,100. The partnership generally lost money from its operations and continued to do so until June 30, 1928. On July 1, 1928, the business known as the Forks Coal Company, the partnership, reverted to its original corporate form known as the Forks Coal Mining Company. Business *129 continued to be unsuccessful and Hughes No. 11 mine was closed down from 1929 to 1932. Operations were resumed in the year 1932 and from that time until 1942 the company operated with indifferent success. The corporation paid petitioner the following sums: 1943
$3,119.30
1944
5,648.68
1945
4,054.02
1946
1,921.12
It was the intent of the parties that the above amounts were received as purchase payments, and hence a return of capital, and were not received as rental payments. Issue 2 During the years before us petitioner was the beneficiary of a trust established by his mother. At this time petitioner was also a guarantor on certain business notes. Upon default of the makers, the trustee of his mother's trust was garnisheed. Accordingly, the trustee paid on the notes the sum of $1,481.77 in 1942. Petitioner did not report this sum as income. The respondent in the deficiency notice increased petitioner's income by this amount. In this year the sum of $1,249.27 was allowed as a bad debt deduction. For the year 1943 the amount of the trust income garnisheed was $1,353.29. Respondent increased petitioner's 1943 income by this sum and allowed the same amount *130 as a capital loss deduction. The adjustment is as follows: (f) Additional allowable deduction for a capi-
tal loss not previously claimed computed
as follows: Payment as guarantor for South
Fork Bituminous Coal Company
$1,353.29
Altoona Textile Company
282.00
Total
1,635.29
Deduction allowable
1,000.00
Capital loss carry-over
$ 635.29
Petitioner received the above amounts of $1,481.77 in 1942 and $1,353.29 in 1943 as income from the trust established by his mother. Petitioner also sustained losses under section 23(e), I.R.C., in the amounts of $1,481.77 in 1942 and $1,353.29 in 1943. Issue 3 During the time that the business was operated as a partnership petitioner loaned the business $40,000. Upon the basis of this indebtedness, on July 1, 1928, the corporation issued the petitioner two notes, one in the amount of $40,000 representing principal, and the second in the amount of $8,400 representing accumulated interest. The corporation notes were 6 per cent interest-bearing notes. Both of these notes from the date of issue to July 21, 1947, were the personal property of the petitioner. The respondent increased the interest *131 income of petitioner for the year 1942 in the amount of $6,129.49 and for the year 1943 in the amount of $8,416.95. His explanation in the deficiency notice for these adjustments was as follows: "(c) It is held that you constructively received interest income on obligations of the Forks Coal Mining Company, Inc., in the sum of $6,129.49 for the taxable year 1942 and in the sum of $8,416.95 for the taxable year 1943." The above adjustments were determined after an examination of the corporation's books indicated that petitioner's personal account contained an excess of debits over credits for the year 1942 in the amount of $6,129.49, and for 1943 in the amount of $8,416.95. Petitioner received the sum of $6,129.49 in 1942, and the sum of $8,416.95 in 1943 as interest income. Opinion Issue 1 Respondent contends that certain payments made to the petitioner by the Forks Coal Mining Company during the years 1943 through 1946 constituted rental income to the petitioner. Petitioner on the other hand alleges that these payments were received as a return of capital and hence are not taxable as income. There is no dispute as to the fact that the petitioner sold some $45,000 worth *132 of mining equipment to the partnership under the agreements of October 29, 1918, and May 22, 1919. Dispute arises when the petitioner says that the money received from the corporation in 1943 through 1946 was received under the terms of these earlier agreements, and that it was received as a return of capital on a second installation of mining equipment placed on the partnership property. A brief resume of the facts will be helpful at this point. Petitioner is an individual but the issues before us arise out of his transactions with a business which was first a corporation, then on July 15, 1920, a partnership, and again on July 1, 1928, a corporation. On October 29, 1918, petitioner agreed to supply the corporation with such equipment as would be necessary to operate the mine at South Fork. Under the terms of the supplemental agreement petitioner was to supply additional equipment and to be paid for this equipment at the rate of 10" per ton of coal mined. Petitioner in compliance with the agreement supplied some $45,000 worth of equipment. On November 15, 1920, he executed a bill of sale and transferred title in this equipment to the partnership. In the latter part of 1921 petitioner *133 equipped his own mine with approximately $38,100 worth of equipment. Later his coal vein ran out and shortly thereafter, about early 1922, he transferred his entire installation to a partnership coal tract in Blandburg, Pa. Petitioner now alleges that the money received in 1943 to 1946 was in fact a return of capital on this equipment. The basis of petitioner's contention is that the second installation of equipment was leased under the terms of the agreements dated October 29, 1918, and May 22, 1919, and like the taxpayer in Truman Bowen, 12 T.C. 446 (dismissed on appeal), the moneys received were payments on purchase price. In the Bowen case we held that monthly payments called "rent" were not actually rent but were in effect part of the purchase price. In that case we distinguished between an ordinary lease and a conditional sale. We cited, on page 459, In Re Rainey, 31 Fed. (2d) 197, as follows: "* * * A lease contemplates only the use of property for a limited time and the return of it to the lessor at the expiration of that time; whereas, a conditional sale contemplates the ultimate ownership of the property by the buyer, together with the use of *134 it in the meantime." From the evidence we conclude that the terms as embodied in the agreements of October 29, 1918, and May 22, 1919, did control the second installation of equipment. Next, we must determine the intent of the parties as established in the agreements. If we look at the agreements it is obvious that the intent of the parties was to provide for a conditional sale. The mining business was to be the ultimate owner of the property; the mining business, in fact, enjoyed the unrestricted use of the property for more than 20 years. Finally when economic conditions improved so that the business could pay the petitioner it did so in 1943, 1944, 1945 and 1946. The record as a whole sustains our finding of fact that the payments were intended as purchase payments rather than rent. An objection might be raised, if we should call these payments a return of capital, in that the agreements themselves denominate the payments as rent. It is necessary to look through the form to substance, and we will always look to the purpose of the transaction. There can be no question as to the purpose and results of the first transaction; its purpose was to provide the business with equipment *135 to carry on its operation, and to make it possible for the business to buy its own equipment. We can not see how the second transaction differed from the first, except as to time. We find from the record as a whole that the petitioner received the following amounts: $3,119.30 in 1943, $5,648.68 in 1944, $4,054.02 in 1945 and $1,921.12 in 1946 as a return of capital, and on this issue we therefore sustain the petitioner. Issue 2 During the years 1942 and 1943 petitioner was the beneficiary of a trust established by his mother, and he was therefore entitled to receive income from the trust. Petitioner was also the guarantor on certain defaulted notes. The trustee was garnisheed and payments of $1,481.77 and $1,353.29 were made on these defaulted notes. In the deficiency notice respondent included the above sums in petitioner's income for the years 1942 and 1943. Although petitioner has alleged error in this adjustment, no argument in support of his allegation of error was presented. From the paucity of evidence on this issue we conclude that the petitioner was unrestrictedly entitled to the benefits of the trust and that the payments attached by the receiver were credited to petitioner's *136 account as the guarantor of the notes. Accordingly, under section 162 (b) of the Code, [1] petitioner's current income from the trust, whether distributed to him or not, shall be included in computing his net income for 1942 and 1943. Petitioner further contends that these sums are deductions allowable in full for his individual income tax. Respondent has allowed $1,249.77 as a bad debt deduction for 1942. Petitioner only claimed $600 on his 1942 return. For 1943 respondent allowed no bad debt deductions but did allow $1,353.29 plus $282 as a capital loss and deductible *137 to the maximum amount of $1,000 with the remainder as a carry-over. We must sustain the respondent in that these sums may not be taken as bad debt deductions. A bad debt deduction under these circumstances can only be allowed under the theory of subrogation wherein the guarantor has a claim against the principal debtor and further that this claim is worthless when the guarantor's payments were made. Evidence has been presented that the notes were not paid in full and under Pennsylvania law subrogation or substitution can not take place until the creditor has been fully paid. Gildner v. First National Bank & Trust Co. of Bethlehem, 19 Atl. 2d 910. We think that there is sufficient evidence to warrant a holding that the petitioner is entitled to deduct these sums as losses under section 23 (e). [2] That these payments of trust income represented a loss to the petitioner can not be seriously questioned. In the petitioner's own words, these losses were sustained "for moneys borrowed in connection with our coal properties". Hence, they were losses incurred in his trade or business and are deductible in the amounts of $1,481.77 and $1,353.29 for 1942 and 1943. See Abraham Greenspon, 8 T.C. 431. *138 Petitioner also alleged that additional payments were made on these defaulted notes. Respondent disallowed these claimed deductions. Except for his request for a finding of fact and a statement of error in the petition, the petitioner has presented no evidence as to these additionally alleged deductions for 1943, 1944, 1945 and 1946. Therefore, respondent's determination as to their disallowance must be sustained. The amounts included in this determination are as follows: Year
Amount
1943
$2,250.00
1944
2,433.71
1945
1,263.00
1946
2,200.00
Issue 3 The next issue involves the sums of $6,129.49 and $8,416.95 which respondent has determined to be interest income. A yearly summary of the entries appearing in the personal account *139 of petitioner with the corporation shows that on January 1, 1942, the debit balance was $23,483.30. Various credits and debits were made to the accounts for the year and on January 1, 1943, the debit balance was $29,612.79. The debit balance had increased some $6,129.49. On January 1, 1944, the debit balance was $38,029.73 or an increase over the preceding year in the amount of $8,416.94. [3]
The petitioner contends that the excess of withdrawals for 1941 and 1942 were amounts received as "payments on account of principal", meaning the $40,000 note. Respondent has determined that these sums represented interest payments. There is nothing in the record to indicate that these withdrawals were credited to principal or interest. We have no evidence that debtor or creditor recognized these payments to be either principal or interest. The Supreme Court of Pennsylvania in Kann v. Kann, 259 Pa. 583; 103 Atl. 369, 371, recognized the well established rule that, except where otherwise agreed, a payment made on an indebtedness consisting of principal and interest, not applied by either party, will be applied *140 first to interest due and then to principal. The petitioner has not asserted a preference for the application of these withdrawals. Therefore, when the respondent determined that the withdrawals were interest payments he must be sustained. Issue 4 The respondent in the deficiency notice increased the petitioner's 1943 net income by $1,000. The respondent's explanation for this adjustment is as follows: "(c) A credit to your personal account on the books of the Forks Coal Mining Company, Inc., of $1,000.00 on April 28, 1943, which appears to represent compensation received from the Brown Johnston Corporation, has been added to your gross income for the taxable year 1943." Petitioner has alleged this to be an erroneous determination, and that this $1,000 was a repayment for a loan. Petitioner has made no further reference to this allegation of error and proffered no evidence in support of his position. Therefore we must sustain the respondent. Decisions will be entered under Rule 50. Footnotes
1. SEC. 162. NET INCOME. The net income of the estate or trust shall be computed in the same manner and on the same basis as in the case of an individual, except that - * * *
(b) There shall be allowed as an additional deduction in computing the net income of the estate or trust the amount of the income of the estate or trust for its taxable year which is to be distributed currently by the fiduciary to the legatees, heirs, or beneficiaries, but the amount so allowed as a deduction shall be included in computing the net income of the legatees, heirs, or beneficiaries whether distributed to them or not. * * *↩
2. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(e) Losses by Individuals. - In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise - (1) if incurred in trade or business; or (2) if incurred in any transaction entered into for profit, though not connected with the trade or business; * * *.↩
3. The deficiency notice uses the figure of $8,416.95.↩