Western Contracting Corporation v. Commissioner.
Western Contracting Corp. v. Commissioner
Docket No. 55906.
United States Tax Court
T.C. Memo 1958-77; 1958 Tax Ct. Memo LEXIS 149; 17 T.C.M. (CCH) 371; T.C.M. (RIA) 58077; April 30, 1958
*149 A corporation purported to lease 93 pieces of heavy construction equipment for varying terms of up to 28 months. The so-called leases were immediately assigned to one bank and all payments by the corporation were made to the bank. At the end of the so-called lease term, the dealers purportedly sold this equipment to the corporation. In each case, the sales price was the difference between the so-called rent and the list price at the beginning of the alleged lease term plus bank finance charges. The equipment was then depreciated over varying terms of from 4 to 8 years. Held, that the so-called leases were intended to be installment purchases and the alleged rent is not deductible under section 23(a)(1)(A), 1939 Code. Held, further, that the respondent's determination of allowable depreciation is approved. Peter L. Wentz, Esq. and Ralph E. Davis, Esq., for the petitioner. Thomas Cravens, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in income tax for the taxable years 1948 and 1949 in the amounts of $169,157.12 and $128,221.42, respectively. The first question is whether monthly payments, which were made under agreements *150 with dealers covering 93 pieces of heavy construction equipment which petitioner used in its business and to which petitioner eventually took title, in the total amounts of $731,046 during 1948, and $586,837.23 during 1949, come within the scope of "rentals or other payments," so as to be deductible under section 23(a)(1)(A), 1939 Code, or constituted payments for which deduction is not allowed as the Commissioner has determined. If the Commissioner's determination is sustained under this issue, there is another question, whether deductions in 1948 and 1949 for depreciation of the same equipment shall be computed upon the straight line method of depreciation, as the Commissioner has determined, or on the basis of abnormal depreciation under which a substantial percentage of the total useful life of each piece of equipment was used in the first two years. Findings of Fact Petitioner, an Iowa corporation organized in 1917, has its principal office in Sioux City, Iowa. Its returns for the taxable years were filed with the collector of internal revenue for the district of Iowa. Petitioner, sometimes referred to hereinafter as Western, keeps its books and reports income on a completed contract *151 basis, with a few exceptions. For example, depreciation which is computed and deducted on an annual basis. Prior to 1946, petitioner engaged in highway construction work, light grading, paving, and some airport work in the states of Iowa, Minnesota, Nebraska, and South Dakota. All of this work involved a one-shift operation of either 8 or 10 hours. Commencing in 1946, petitioner entered into contracts for heavier types of construction, as a general contractor, involving heavy grading and earth moving in the construction of dams, tunnels, canals, turnpikes, airports, and similar projects which were located in various states besides those mentioned above. During the years 1946-1949, inclusive, the principal projects where petitioner had contracts were as follows: Kanopolis Dam constructed at Kanopolis, Kansas. Dubuque-Jackson County highway near Dubuque, Iowa, involving grading and paving. Grading the Yuma-Gila Bend highway near Yuma and Wellton, Arizona. Construction of a railroad tunnel near Pound, Virginia and Jenkins, Kentucky for the C & O Railroad. Construction of the Delta-Mendota irrigation canals near Wesley, California. A contract with the United States Army Corps of Engineers *152 involving the movement of earth and material in connection with the construction of the Fort Randall Dam near Pickstown, South Dakota. The nature of the work done by petitioner at these locations is set forth hereinafter. The years during which petitioner was engaged in work at the projects named above were as follows: Kanopolis Dam, 1946, 1947, 1948; Dubuque-Jackson County highway, 1946, 1947, and 1948; Yuma-Gila Bend highway, 1946 and 1947; C & O tunnel, 1946, 1947, and 1948; Delta-Mendota canals, 1946, 1947, 1948, and 1949; Fort Randall Dam, stage I, 1948; Fort Randall Dam, stage II, 1949. The heavier construction contracts which petitioner obtained, beginning in 1946, required the use of heavier equipment, such as heavy excavation equipment and heavy off-highway hauling units rather than light, short haul excavating and hauling highway equipment. In the heavier work petitioner used, for example, 135 horsepower tractors and 20 to 30 ton end dump and bottom dump hauling units, rather than 60-80 horsepower tractors and 2 to 2 1/2 ton end dump trucks. Petitioner did not own the heavier equipment which was required on the projects for which it obtained contracts beginning in 1946. Furthermore, *153 petitioner required more working capital on the heavy construction work which was done under more costly contracts than lighter construction work. In 1946, when petitioner needed heavier equipment, petitioner's working capital was low. Banks would not permit petitioner to tie up their short term borrowings in capital assets. In an effort to obtain working capital in 1946, petitioner attempted to sell equipment debentures but there was no demand for them. Petitioner was able to purchase for cash some additional equipment. Some equipment which is not involved here, was rented during the years 1946-1949. Other equipment was obtained under arrangements which give rise to the first issue in this case, which are described hereinafter. With respect to the equipment which respondent agrees was rented, the facts are as follows: Thirty pieces of equipment were rented under short leases running for from 1 to 5 months. Most of the 30 items of equipment were used equipment at the time they were rented to petitioner. Some of the leases contained specific provisions with respect to the number of shifts on which such equipment was to be used. The leases covering the equipment were entered into at *154 a project and all rent payments were made from the project, not from petitioner's main office. A lease covered a period during which a piece of equipment was to be used on a particular job. Every one of the 30 items was returned to the lessor at the end of a lease. In its accounting records and in its income tax returns, petitioner separated the payments which it made under the leases for the 30 pieces of equipment from payments which it made under other agreements relating to equipment, describing the rental payments as "Third Party Equipment Rentals." The construction equipment which is in issue here was obtained in the following way: Petitioner entered in 75 written agreements called, "lease agreement," which covered 93 pieces of equipment, which is sometimes referred to hereinafter as the equipment in controversy. All of the equipment was new, with the exception of 3 items. The "lease agreements," which are referred to hereinafter as the agreements, were made from petitioner's main office in Sioux City, and all payments thereunder were made from the main office. The agreements were made with 10 different, regularly franchised equipment dealers, with the exception of 6, which were *155 made with petitioner's then president and controlling stockholder who, later, transferred those agreements to a dealer. The agreements were for minimum terms of from 7 to 28 months, as is shown hereinafter. Petitioner took title to each of the 93 pieces of equipment at the end of the period designated as the "minimum period" of the lease in each agreement upon the payment of an additional amount, which is sometimes referred to hereinafter as the end payment. All of the equipment was used wherever and whenever needed. Use was not limited to a particular job or project. However, in its books petitioner charged payments made in respect to such equipment to a specific job. The 93 items in controversy were all large, heavy duty pieces of equipment, the use of which on public highways was prohibited because of their size and weight. They were as follows: 45 bottom dump and end dump Euclid and Mack hauling units, 15 tractors, 7 patrols, 6 small cranes and draglines, 4 tournapulls, 3 water wagons, 3 electric or diesel shovels, 3 scrapers, 2 International service trucks, 1 electric generator, 1 diesel generator, 1 roller, 1 formgrader, and 1 paver. The agreements provided, in general, for *156 monthly "rental" payments during the term of the agreement, which was for a "minimum period" of a stated number of months. Petitioner was obligated to pay the freight or delivery charges upon delivery of equipment to it, or upon return of the equipment to the dealer. The following agreement is typical of all the agreements: "LEASE AGREEMENT "THIS AGREEMENT made by and between Missouri Valley Machinery Co. of Omaha, Nebraska, Lessor, and Western Contracting Corporation of Sioux City, Iowa, Lessee: "WITNESSETH, That the owner has this 18th day of February, 1947, rented to the Lessee the following described machinery and/or equipment, hereinafter called 'Equipment': "1 - New 'Caterpillar' Diesel Electric Set, Self-Regulated, with Standard gasoline starting engine, Model D-17000, Serial No. 8S 5064, equipped with #1F 8999 Generator Arrangement, Serial No. 101KH406, Foundation bolts, Fuel Lines, Muffler, Radiator with Blower Fan, and Safety Device. "The parties hereto agree as follows: Said equipment shall be shipped to Lessee at Jenkins c/o G. R. Jenkins,…, Kentucky, on or about the 18th day of February, 1947, freight or delivery charges collect. "Lessor further agrees to furnish in connection *157 with said equipment, the following: "as shown above "This lease is for a minimum period of eighteen months commencing on the 18th day of February, 1947, and Lessee agrees to pay as rental therefor the sum of $370.00 per month "Lessee agrees to keep the equipment in good repair and condition, and to return the equipment in as good condition as when leased, reasonable wear and tear expected. "Lessee shall be liable for any and all damage caused to any persons or property while said equipment is in its possession. "LESSOR "Missouri Valley Machinery Co. By (Signed) C. A. NEEDHAM General Manager" "LESSEE "Western Contracting Corporation By (Signed) P. J. BOYLE Treas. (Signed) H. GARLAND EVERIST Secy." The procedure which was followed with respect to the agreements in question was as follows: Upon executing an agreement of the kind set forth above, the agreement, on the same day, was assigned by the equipment dealer to the Toy National Bank of Sioux City, and the bank would lend the dealer an amount equal to either the dealer's cost of the equipment or the full amount to be paid by Western under the agreement. A consent to the assignment which was executed by Western, together with a chattel *158 mortgage executed by the dealer were given to the bank as consideration and security for the loan to the dealer. The chattel mortgages were duly recorded. Thereafter, petitioner made the payments agreed to in the agreements to the Toy National Bank. The then president of Western, Hubert Everist, initially made the above arrangements with the bank which had not had any prior contacts with most of the dealers involved. At or near the end of the term of each agreement, a dealer would make an offer to "sell" each item of equipment covered by an agreement to Western under a letter. Typical of these offers is the following letter: "August 14, 1958 "Western Contracting Corp., Sioux City, Iowa. "Attention: Mr. J. P. Nye "Gentlemen: "The following contractor's equipment is available for sale, subject to immediate acceptance: "1 - Used 'Caterpillar' DI7000 Diesel Electric Set, Serial No. 8S5064, equipped with 1 F8999 Generator, Serial No. 107EH46. "The price of this equipment, as is, where is including prepaid freight charges is $2,607.48. "If you are interested in this unit, please get in touch with us within the next few days. "Very truly yours, MISSOURI VALLEY MACHINERY CO. (Signed) C. *159 A. NEEDHAM General Manager" The price quoted by the dealer in these offers was the list price (the price at which Western originally could have acquired an item when the agreement was executed), less the total payments which had been made under an agreement, plus financing charges. The net "purchase price" generally represented the dealer's profit, plus financing charges. With respect to all the equipment in controversy, Western, by letter, accepted the dealer's offer and requested an invoice for the amount stated in the dealer's offer. Upon receipt of the invoice, Western paid the amount by check, and received a "paid" invoice and a document denominated, "Bill of Sale," covering the particular item of equipment involved. In Western's books, only the "purchase price" was capitalized and placed in the capital account, and depreciation was claimed thereafter. In every instance, title to a piece of equipment was transferred to Western at or near the end of the agreement. Under the agreements, petitioner was obligated to make the periodic payments regardless of whether equipment was being used. Petitioner did no work on any project during two or three months of each year because of adverse *160 weather conditions. Nevertheless, the periodic payments were continued during each month of an idle period. The length of the equipment agreements ranged from 7 to 28 months as follows: No. of Months
Items of Equipment
7
3
8
2
9
2
10
14
11
3
12
13
14
7
15
18
17
11
18
1
20
16
21
2
28
1
93 The average length of the agreements was 13.98 months. When compared with the retail list price on the date of the agreement, the total of so-called rental payments on the equipment in controversy ranged from 60.70 per cent of the list price to 97.56 per cent of that price, with an average of 77.20 per cent. The dealers were primarily interested in selling their merchandise new. During the years in controversy the type of agreement which is involved here was being used widely in the industry and a dealer stood the chance of losing a customer if he did not use such agreement. There was no provision in any of the agreements entered into by Western which obligated Western to purchase the equipment at the end of the term of an agreement, or which gave petitioner the option to purchase the equipment at the end of the term. It was an industry custom, however, to offer the equipment covered by such agreements to the contractor at the *161 end of the term of the agreement before offering it to anyone else. When the agreements in question were signed, the dealers knew about the use to which the equipment was going to be devoted. Most of the dealers made periodic inspections of the equipment. However, none of the dealers inspected any of the equipment immediately before offering to convey it to petitioner. Some dealers never inspected the equipment. During the term of each agreement and before petitioner took title, none of the equipment in controversy was carried on petitioner's books as an asset and no depreciation thereon was taken. On the books of the dealers, the equipment in controversy was carried in a suspense account, by most, during the term of an agreement. However, some dealers treated the equipment as sold, as of the date of an agreement and reported income from an agreement as of the time of entering into the agreement. None of the equipment dealers took depreciation deductions for the equipment in controversy, with the exception of one dealer who was told to do so as the result of an audit by respondent's agents. The dealers treated the transactions covered by the socalled lease agreements, on their books, *162 as sales, although they were not usually treated as closed sales until the final payment was received. The dealers paid a sales tax on each so-called lease transaction. The petitioner paid personal property taxes on all items of equipment which were located on its projects at the assessment date, including the equipment covered by the agreements which are in dispute. The dealers, on the other hand, did not pay a personal property tax on any of the 93 items in question. Petitioner bore the expenses of originally shipping the equipment in question to its projects for use. Shipping charges ranged from $400 to $2,500 for a piece of equipment. The rental rate on heavy construction equipment in a straight rental transaction varies with the length of the period for which the equipment is rented. Normally, the shorter the rental period the higher the rental rate. The normal profit margin obtained by equipment dealers on heavy construction machinery is approximately 20 per cent of the manufacturer's price to the retail dealer. During the years 1946, 1947, and 1948 the demand for construction equipment was in excess of the supply. In 1949, supplies of such equipment increased, but the Korean *163 War created another period of supply shortages and an average increase in the price of used construction equipment was close to but less than 20 per cent. One of the agreements in question was executed in December 1945; 35 were executed in 1946; 4 in 1947; 33, in 1948; and 20, in 1949. Exhibit 22, a schedule which tabulates data about the 93 items, is incorporated herein by this reference. The number of items for which end payments were made and titles were taken in the years 1947 through 1951 were as follows: 26 in 1947; 13 in 1948; 15 in 1949; 38 in 1950; and 1 in 1951. For the 93 items, the periodic payments totaled $1,541,778; the end payments totaled $408,531; and the aggregate of all payments totaled $1,950,309. Petitioner made periodic payments on the equipment in question, which it contends were rentals which were required for the use of the equipment, in the total amounts of $731,046 during 1948, and $586,837.23 during 1949. After petitioner completed making all of the payments, including the end payments, on each piece of equipment, it continued to use the equipment for a few years but eventually it sold 49 pieces; it traded 10 pieces in the acquisition of other equipment; *164 it converted 10 pieces to other uses; and it scrapped 3 pieces, leaving 21 pieces which it retained as late as 1956, or longer. The majority of the sales of equipment by petitioner were made during the years of the Korean War. When petitioner sold any of the pieces of equipment in controversy, it reported gain, if any, as capital gains in its returns. Illustrative of the comparisons between the total amount which petitioner paid for each item of equipment which it later sold or traded for other equipment is the following schedule.. EQUIPMENT SOLD AFTER ACQUISITION
Resale
Total
Price or
Periodic
End
Total
Trade-In
Item
Paym'ts
Paym't
Paid
Value *
1
$ 10,875
$ 2,672
$ 13,547
$ 7,000
2
10,875
2,672
13,547
8,075
3
14,000
3,921
17,921
14,250
4
14,000
3,921
17,921
14,250
6
10,500
3,940
14,440
7,000
8
10,500
3,940
14,440
8,075
9
10,500
4,327
14,827
8,075
10
10,500
4,327
14,827
8,075
14
10,500
4,336
14,836
7,000
17
9,800
5,032
14,832
7,000
18
10,500
4,328
14,828
7,000
20
6,000
1,601
7,601
6,500
23
6,000
1,599
7,599
5,355
24
10,000
2,811
12,811
281 *
25
5,425
3,512
8,937
11,880
26
18,000
6,115
24,115
19,250
27
20,000
5,080
25,080
19,000
28
9,000
3,366
12,366
11,000
30
9,900
3,711
12,611
11,000
31
7,440
2,055
9,495
5,625
32
6,965
4,500
11,465
11,880
33
20,000
4,540
24,540
15,975
35
80,000
26,590
106,590
107,500 *
36
5,000
1,550
6,550
2,700
37
5,000
1,550
6,550
3,285
38
3,500
1,625
5,125
2,250
43
105,000
37,757
142,757
140,000 *
46
16,000
4,046
20,046
20,000
47
16,000
4,046
20,046
20,000
48
16,000
4,046
20,046
20,000
49
16,000
4,046
20,046
20,000
50
16,000
4,046
20,046
20,000
51
16,000
4,048
20,048
20,000
52
16,000
4,048
20,048
21,000
53
16,000
4,048
20,048
20,000
54
16,000
4,048
20,048
20,000
55
16,000
4,048
20,048
21,000
56
16,000
4,048
20,048
20,000
57
16,000
4,048
20,048
20,000
58
16,000
4,048
20,048
20,000
59
16,000
,0048
20,048
20,000
60
16,000
4,048
20,048
21,000
61
8,496
4,438
12,934
9,675
62 **
9,520
238
9,758
4,500
64 **
9,520
238
9,758
32 *
66
7,000
2,442
9,442
5,000
67
7,000
2,442
9,442
5,000
70
8,000
2,775
10,775
770 *
71
140,000
23,367
163,367
156,800
72
12,000
2,350
14,350
9,975
73
9,000
2,790
11,790
1,492 *
74
9,000
2,790
11,790
1,492 *
75
14,850
3,331
28,181
3,000
76
13,200
4,419
17,619
9,675
77
9,000
2,700
11,700
1,201 *
78
9,000
2,785
11,785
1,323 *
79
14,300
3,603
17,903
1,603 *
80
45,000
14,458
59,458
31,750
82
14,300
3,169
17,469
12,550
59
*165 The above schedule shows that in 21 instances, equipment was sold by petitioner (after having given it heavy use) for substantially the same amount, or more, than the total amount paid for the equipment; in 6 instances the amount realized upon sale (after heavy use) was over 80 per cent of what petitioner paid for the equipment; and in 21 instances petitioner realized close to or over 50 per cent of what it paid. That is to say, upon the sale of equipment which it had used, petitioner realized 50 per cent or more of what it had paid for equipment in 48 instances out of 59. The following schedule shows, for each of the 93 items of equipment in issue, the term of the so-called lease agreements; the periodic and end payments which were made, expressed in even dollar amounts; the dates of the end payments; the dealer's list price for each item; the eventual disposition of each item, whether sold, converred, scrapped, or retained; and the dates when each item was sold, traded, converted, or scrapped. Acquisition and Disposition - 93 Items
Term of
Total
End
Agreement
Periodic
End
Payment
List
Dispositi
Resale
on
Item
Months
Payments
Payment
Date
Price
Date
Price
1
15
$ 10,875
$ 2,672
7/24/47
$ 13,180
8/22/55
$ 7,000
2
15
10,875
2,672
7/24/47
13,180
8/24/53
8,075
3
14
14,000
3,921
7/24/47
17,407
5/ 2/51
14,250
4
14
14,000
3,921
7/24/47
17,407
5/ 2/51
14,250
5
15
10,500
3,911
11/14/47
13,974
5/ /51
Converted
6
15
10,500
3,940
11/14/47
13,974
8/22/55
7,000
7
15
10,500
3,940
11/14/47
13,974
4/ /53
Converted
8
15
10,500
3,940
11/14/47
13,974
8/24/53
8,075
9
15
10,500
4,327
11/14/47
14,379
8/24/53
8,075
10
15
10,500
4,327
11/14/47
14,379
8/24/53
8,075
11
15
9,800
5,032
11/14/47
14,379
5/ /51
Converted
12
15
10,500
4,338
1/ 5/48
14,379
5/ /51
Converted
13
15
10,500
4,338
1/ 5/48
14,379
5/ 51
Converted
14
15
10,500
4,336
1/ 5/48
14,379
8/22/55
7,000
15
15
10,500
4,328
1/ 5/48
14,379
8/ /55
Converted
16
15
10,500
4,471
6/30/48
14,379
9/ /55
Converted
17
15
9,800
5,032
1/ 5/48
14,379
8/22/55
7,000
18
15
10,500
4,328
1/ 5/48
14,379
8/22/55
7,000
19
15
10,500
4,328
1/ 5/48
14,379
3/ /53
Converted
20
12
6,000
1,601
12/31/47
7,424
5/ 2/51
6,500
21
12
9,600
4,277
1/ 5/48
13,510
Retained
22
8
5,200
1,100
1/27/47
6,199
Retained
23
12
6,000
1,599
11/24/47
7,424
8/22/52
5,355
24
10
10,000
2,811
3/ 1/47
12,612
3/24/53
281 *
25
7
5,425
3,512
7/17/47
8,051
8/27/52
11,880
26
10
18,000
6,115
5/ 6/47
23,670
4/ 1/54
19,250
27
10
20,000
5,080
5/ 6/47
24,587
11/ 2/53
19,000
28
12
9,000
3,366
4/ 7/48
12,074
12/15/51
11,000
29
8
5,880
2,674
4/ 7/48
8,405
Retained
30
9
9,900
2,711
1/15/49
12,216
12/15/51
11,000
31
12
7,440
2,055
8/14/47
9,220
4/25/48
5,625
32
7
6,965
4,500
2/20/47
11,275
3/22/52
11,880
33
10
20,000
4,540
1/27/47
24,143
3/16/56
15,975
34
7
2,450
300
1/27/47
2,731
Retained
35
20
80,000
26,590
7/ 9/48
102,440
1/13/53
107,500 *
36
10
5,000
1,550
5/31/47
6,300
4/23/51
2,700
37
10
5,000
1,550
5/31/47
6,300
6/13/51
3,285
38
10
3,500
1,625
9/24/47
4,998
4/23/51
2,250
39
18
6,660
2,607
8/17/48
8,977
Retained
40
10
15,000
7,415
5/ 6/47
21,427
Retained
41
14
5,600
456
6/10/49
5,838
Retained
42
14
5,600
456
6/10/49
5,838
Retained
43
15
105,000
37,757
1/ 4/50
137,392
5/14/50
140,000 *
44
15
70,000
21,472
1/20/50
87,418
Retained
45
12
12,000
2,559
4/14/49
14,200
1/ /52
Converted
46
20
16,000
4,046
1/20/50
20,000
5/19/51
20,000
47
20
16,000
4,046
1/20/50
20,000
5/19/51
20,000
48
20
16,000
4,046
1/20/50
20,000
5/19/51
20,000
49
20
16,000
4,046
1/20/50
20,000
5/19/51
20,000
50
20
16,000
4,046
1/20/50
20,000
5/19/51
20,000
51
20
16,000
4,048
1/13/50
20,000
5/19/51
20,000
52
20
16,000
4,048
1/13/50
20,000
5/10/51
21,000
53
20
16,000
4,048
1/13/50
20,000
6/14/51
20,000
54
20
16,000
4,048
1/13/50
20,000
6/14/51
20,000
55
20
16,000
4,048
1/13/50
20,000
6/13/51
21,000
56
20
16,000
4,048
1/13/50
20,000
5/19/51
20,000
57
20
16,000
4,048
1/13/50
20,000
5/19/51
20,000
58
20
16,000
4,048
1/13/50
20,000
5/19/51
20,000
59
20
16,000
4,048
1/13/50
20,000
5/19/51
20,000
60
20
16,000
4,048
1/13/50
20,000
5/10/51
21,000
61
9
8,496
4,438
1/15/49
12,607
8/27/52
9,675
62 **
14
9,520
238
5/31/49
9,520
9/12/51
4,500
63 **
14
9,520
238
5/31/49
9,520
4/ 1/54
Scrapped
64 **
14
9,520
238
5/31/49
9,520
3/24/53
32 *
65
10
10,000
2,772
3/12/49
12,541
10/15/55
Scrapped
66
10
7,000
2,442
3/28/49
9,434
3/27/51
5,000
67
10
7,000
2,442
3/28/49
9,434
3/27/51
5,000
68
10
10,000
2,772
3/12/49
12,541
12/ /51
Converted
69
12
11,000
3,352
8/10/49
13,986
10/15/55
Scrapped
70
10
8,000
2,775
4/14/49
10,588
3/24/53
770 *
71
28
140,000
23,367
1/10/51
163,146
9/26/51
156,800
72
12
12,000
2,350
11/23/49
14,041
9/13/51
9,975
73
12
9,000
2,790
8/18/50
11,481
3/24/53
1,492 *
74
12
9,000
2,790
8/18/50
11,481
3/24/53
1,492 *
75
11
14,850
3,331
3/14/50
17,587
11/12/54
3,000
76
12
13,200
4,419
5/15/50
17,168
8/28/52
9,675
77
10
9,000
2,700
2/24/50
11,481
3/24/53
1,201 *
78
12
9,000
2,785
5/ 8/50
11,481
3/24/53
1,323 *
79
11
14,300
3,603
3/ 7/50
17,342
3/24/53
1,603 *
80
15
45,000
14,458
7/25/50
59,275
3/16/56
31,750
81
12
6,000
672
4/ 7/50
6,520
Retained
82
11
14,300
3,169
3/ 7/50
17,076
10/ 1/52
12,550
83
17
23,182
6,883
9/28/50
29,990
Retained
84
17
23,182
6,883
9/28/50
29,990
Retained
85
17
23,182
6,883
9/28/50
29,990
Retained
86
17
23,182
6,883
9/28/50
29,990
Retained
87
17
23,182
6,883
9/28/50
29,990
Retained
88
17
23,182
6,883
9/28/50
29,990
Retained
89
17
23,182
6,883
9/28/50
29,990
Retained
90
17
23,182
6,883
9/28/50
29,990
Retained
91
17
23,182
6,883
9/28/50
29,990
Retained
92
17
23,182
6,883
9/28/50
29,990
Retained
93
17
23,182
6,883
9/28/50
29,990
Retained
*166 The percentage relationship of the total amount of periodic payments to the amount of the end payment, for each piece of equipment, ranged from 60.75 per cent to 97.5 per cent. The ratio in 16 instances is from 80 per cent to 97.5 per cent; the ratio in 51 instances is from 75 per cent to 80 per cent; and the ratio in the remaining 26 instances is from 60.75 per cent to 75 per cent. The usual practice employed by dealers in determining the total amount of the periodic or monthly payments under the type of agreement involved here was to arrange for the payment of monthly amounts which, during the term of the agreement, would be equal to the dealer's cost of the piece of equipment. The conditions under which petitioner used the 93 items of equipment in controversy is briefly indicated by the following: The Kanopolis Dam project involved the construction of an earth dam. At the location the soil is a glacial till containing many rocks and boulders and much sand. Two 10-hour shifts were worked each day. The Dubuque-Jackson job was a highway grading and paving project near Dubuque, Iowa, along the Mississippi River, *167 in very rough precipitous country. The work was considerably different from paving work performed by petitioner in years prior to 1946. Petitioner carried on operations on this job during the years 1946, 1947, and 1948. The contracting agency was the Iowa Highway Commission. The movement of earth involved the operation of two 10-hour shifts and the paving required one shift of 10 or 11 hours. Fifty per cent of the yardage moved was rock. It was wet and muddy in the spring, and hot and dry in the summer. The labor supply on this job was fairly normal. The Yuma-Gila Bend job was a highway grading job located near Wellton, Arizona, and Yuma, Arizona. The contract was with the Arizona Highway Commission. Petitioner worked on this job during 1946 and 1947. It involved mountain highway construction and was considerably different from any grading job performed by petitioner prior to that time. All of the operations were performed either in a very sandy soil or in a heavy, rocky material. The terrain was very mountainous with excessive upgrades and downgrades. There was very little efficient or experienced help available. The C & O Tunnel job was located near Pound, Virginia, and Jenkins, *168 Kentucky, and consisted of the construction of a railroad tunnel through mountainous country. This was an entirely new type of construction work for petitioner. Tunnel equipment is track-mounted. The job required jumbos and mucking machines and railroad cars, a type of equipment never before used by petitioner. The contract was with the Chesapeake & Ohio Railroad. Petitioner worked on this job during 1946, 1947, and 1948. The project involved excavating and hauling approximately 800,000 cubic yards of wet, sticky clay and the excavating and hauling of the remaining open cut covering 7 to 8 miles of very rocky and mountainous terrain. There were extreme amounts of rainfall, particularly in the fall, winter, and spring. No experienced crews were available and there was a high rate of labor turnover. Three 8-hour shifts were worked in the tunnel, and two 10-hour shifts were worked outside the tunnel. The Delta-Mendota Canal job, located on the west side of the San Joaquin River in the Central Valley of California, near Wesley, California, involved the construction of an irrigation canal. The contract was with the Bureau of Reclamation of the Department of Interior and was performed by *169 petitioner during the years 1946, 1947, 1948, and 1949. The soil varied from sandy material to heavy rock. The terrain was rough and mountainous, and the climate was extremely hot, dry, and dusty in the summer, with continuous rain for four months in the winter. Petitioner worked three 8-hour shifts six days a week. Much of the labor was inexperienced and there was a rapid turnover of labor. Since petitioner was operating three 8-hour shifts, repairs had to be made between shifts and were thus very limited. The Fort Randall Dam, Stage I and II, job was located near Pickstown, South Dakota, and involved the movement of 11 1/2 million cubic yards of material in 1948 and 9 1/2 million cubic yards of material in 1949. The contract was with the U.S. Army Corps of Engineers. On this job petitioner operated two 10-hour shifts six days a week, except for three months in the fall of 1948, when it operated two 11-hour shifts seven days a week. The soil consisted of a shale-and-rock formation overlaid with glacial till which is a compressed earth and conglomerate rocky material. It was abrasive and much of it required blasting. The project was situated between two high banks across a river bed. *170 The terrain was rough with steep and excessive upgrades and downgrades. The climate was very hot, dry, and windy in the summer with temperatures ranging up to 120 degrees Fahrenheit. The winters were very cold and windy with temperatures as low as 25 degrees below zero. The area is semi-arid and therefore very dusty. A portion of the excavation was below the water level in wet, mucky material. The labor, available for this job, consisting mainly of untrained farm hands, was very inexperienced and inefficient. There was a very heavy turnover of employees on the job. During the years 1946-1949, inclusive, Western owned more than 93 major items of construction equipment in addition to and of the same type as the 93 items of equipment which are in controversy here. The undepreciated basis of such other equipment as of January 1, 1948, was approximately $1,050,000. Since at least 1944, petitioner has consistently claimed depreciation on all of its equipment, including all its depreciable heavy construction equipment, on a straight line basis, and at no time has petitioner requested permission from the Commissioner to change its method of computing depreciation. In 1944, after an audit *171 of petitioner's returns for the taxable years 1942 and 1943 by one of respondent's agents, the following basis for depreciation rates on the equipment then listed was recommended to and was used by the petitioner. (a) 1 yard and larger shovels, draglines, etc., 8 years estimated useful life, with a 10 per cent salvage value. (b) Utility cranes, less than 1 yard shovels, draglines and trenching equipment, 7 years useful life, with a 10 per cent salvage value. (c) Tractors, patrols, heavy rollers, elevating graders, dozers, scrapers, rooters, scarifiers, 105 cubic foot compressors and large generators, 5 years useful life, with a 10 per cent salvage value. In claiming depreciation on Euclid trucks and heavy hauling units, petitioner has treated them as comparable to tractors, patrols, heavy rollers, etc., and used a 5-year useful life, with 10 per cent salvage value. For all years subsequent to 1944, petitioner has consistently claimed depreciation on all of its depreciable construction equipment both used and new, in accordance with the above rates. Similar equipment to that here in controversy was used by petitioner on the same projects and under the identical operating conditions *172 as the equipment in controversy during the years 1946 to 1949, inclusive. Petitioner did not then claim, and does not now claim, accelerated or abnormal depreciation on any of that equipment. In the income tax return filed by petitioner for the taxable year 1948, it claimed a deduction for repairs in the amount of $1,033,040.07. This amount represented the expenditure for repair parts only on the contracts or projects completed by Western in the year 1948. The labor costs incurred in making repairs on the equipment utilized on the contracts or projects completed in 1948 represented an additional, undetermined amount. In the income tax return filed by petitioner for the taxable year 1949, it claimed a deduction for repairs in the amount of $428,122.04. This amount represented the expenditure for repair parts only on the contracts or projects completed by Western in the year 1949. The labor costs incurred in making repairs on the equipment utilized on the contracts or projects completed in 1949 represented an additional, undetermined amount. The repair expenditures were made with respect to all equipment used on the contracts completed in 1948 and 1949, including equipment owned outright, *173 the equipment in controversy, and rented equipment. No records have ever been maintained by petitioner from which it would be possible to ascertain the extent to which repairs were made to any particular item of equipment. The items of equipment in controversy were designed, engineered, and constructed to perform construction work wherever it was found regardless of how rugged or difficult the work might be. Equipment such as is here in controversy, may be adversely affected by multiple shift operations, night operation, operation by inexperienced help, climatic conditions, soil conditions and terrain. The useful life of any particular item of construction equipment is materially affected by the extent to which repairs are made and maintenance is carried on. During the years 1946 through 1949 petitioner averaged 8 or 9 working months a year, and on some of its larger projects, including construction of large dams, petitioner used its equipment, including that in controversy on two 10-hour shifts for six days a week. Petitioner carried on extensive repair programs at each project. Temporary stalls were erected and field maintenance was handled by mobile service trucks. When an item *174 of equipment broke down, the inoperative part, whether it was a tire, caterpillar track, motor, transmission, or rear end, was immediately replaced and the piece of equipment was returned to the job. Service work, where possible, was done between shifts. The cost of these replacements was not capitalized but was charged to expense, resulting in a substantial increase in petitioner's repair expenditures. The use of the 93 pieces of equipment in controversy resulted in substantial increases in petitioner's expenditures for repairs during the years 1946-1949, inclusive. The maintenance program consisted primarily of replacements of such parts as engines, transmissions, tracks, and other parts as they failed. No major overhauls were done. The program was designed to preserve the equipment and keep it operative. As stated above, petitioner deducted $1,033,040.07 and $428,122.04, in its returns for 1948 and 1949, respectively, for all repairs. However, petitioner kept no records which would indicate the portion of such repair costs which applied to or was allocable to the equipment in controversy. In its returns for 1948 and 1949, petitioner deducted $218,519.07 and $248,411.03, respectively, *175 for depreciation on equipment other than paving and office equipment. During the years involved, petitioner's employees periodically inspected the equipment in controversy. Petitioner's master mechanics operated each item twice a week and made visual inspection. The equipment was never actually dismantled in any way to inspect it and ascertain its condition as of the end of a particular year, or at the conclusion of a particular project. The internal working parts of the equipment were inspected for wear only when the particular item had to be dismantled to make a repair to keep it operating. No actual determination was made by petitioner of the probable remaining useful life of any particular piece of equipment in the group in controversy at the end of any particular year. Petitioner capitalized only the amounts of the end payments which it made when it took title to each piece of the equipment in question, and thereafter took depreciation on that basis. It took such depreciation on a straight line basis, using estimated useful life for each item on the basis of the rates referred to above. Such was calculated to begin from the time of the end payment. Petitioner deducted the monthly *176 payments made under the "lease agreements" as rental payments. Respondent's determinations of allowable depreciation for each of the 93 items of equipment in controversy, as revised to reflect certain agreed corrections (as shown by exhibit 33-E which is incorporated herein by this reference), are based upon the straight line method and, also, upon the identical depreciable, or useful, lives of each item as were used by petitioner when it capitalized the amount of its "end payment" for each item. However, respondent's determinations capitalized the entire amount of the payments made with respect to each of the 93 pieces of equipment under the so-called lease agreements as of the date when each "lease agreement" was entered into, so that petitioner has been allowed (by way of adjustments) depreciation deductions in years earlier than the years in which the "end payments" on the various pieces of equipment were made by petitioner. That is to say, respondent has allowed depreciation of each of the 93 items from the date of the execution of each "lease agreement" rather than from the date of the end payment in respect to each item. Respondent disallowed deductions which petitioner took *177 as rental payments for the use of the 93 items in the years 1948 and 1949 in the amounts of $731,046 and $586,837.23, respectively. He has allowed petitioner, correspondingly, deductions for additional depreciation with respect to the 93 items of equipment in the total amount of $342,847.11 for 1948, and $312,568.40 for 1949, which amounts give effect to revisions based upon evidence adduced during the trial. The so-called lease agreements covering the 93 pieces of equipment were in substance installment sales agreements. The true arrangement, which the so-called lease agreements represented, was not a rental and lease arrangement. Under all of the circumstances, it was petitioner's intent to acquire title to and retain each of the 93 items of equipment at the time it entered into each agreement with a dealer. The payments which aggregated $731,046 in 1948, and $586,837.23 in 1949, in respect of the 93 items, did not constitute rental payments but were, in fact, payments of the purchase price of each of the disputed items, by the payment of which petitioner was acquiring an equity in each piece of equipment. The total amount of the allowable depreciation on all of the items of equipment *178 in controversy for 1948 and 1949 is not greater than the respondent has determined as set forth in exhibit 33-E. Opinion HARRON, Judge: The Commissioner disallowed deductions in 1948 and 1949 of $731,046 and $586,837.23, respectively, which are the total amounts of monthly payments made by petitioner in each year under "lease agreements" with dealers in contractors' construction equipment. He disallowed the deductions on the ground that monthly payments in respect of each one of 93 items of machinery, such as hauling trucks, tractors, diesel shovels, graders, and cranes and draglines, were not rental expense within the meaning of section 23(a)(1)(A), 1939 Code. He determined, further, that in view of his holding that the equipment involved was purchased and not rented, petitioner was entitled to deductions in the taxable years for allowable depreciation on each item, and, also, that the straight line method of computing the allowance for depreciation is the proper method. Issue 1 The first question to be decided is whether the so-called "rental" payments which were made under "lease" agreements were in fact payments of rent within the definition of rent in section 23(a)(1)(A), or *179 were payments through which petitioner acquired something of value under the entire transaction, other than "the continued use or possession" of the pieces of equipment, and was establishing an equity in each item. Petitioner contends that it did not have and was not acquiring any equity in any item during the terms of the "lease" agreements which related to the specific items; and that the agreements were in fact equipment lease agreements under which the monthly payments were for the continued use or possession of equipment, so that the payments constituted rent, and nothing else. Petitioner points out that there was no provision in any of the written "lease" agreements which either obligated petitioner to purchase the equipment, or gave it an option to do so at any time during or at the end of the term of the "lease"; and it claims that there was no other agreement or understanding, written or oral, which gave petitioner an option to purchase or obligated it to acquire title to any of the property. Petitioner claims, also, that when it entered into the agreements its intent was to rent the equipment, and was not to buy it; and the "lessor's" intent, in each case, was to lease the *180 equipment, and was not to sell it. The petitioner relies on: Abramson v. United States, 133 Fed. Supp. 677; Benton v. Commissioner, 197 Fed. (2d) 745; Breece Veneer and Panel Co. v. Commissioner, 232 Fed. (2d) 319, reversing 22 T.C. 1386; Estate of Clarence B. Eaton, 10 T.C. 869. The respondent relies on: In re Rainey, 31 Fed. (2d) 197; Chicago Stoker Corporation, 14 T.C. 441; Truman Bowen, 12 T.C. 446; Judson Mills, 11 T.C. 25; Goldfields of America, Ltd., 44 B.T.A. 200; Helser Machine and Marine Works, Inc., 39 B.T.A. 644; Holeproof Hosiery Co., 11 B.T.A. 547. The question of whether a particular transaction is a sale or a lease is a question of substance, and not form. Substance is governed by the intent of the parties. Hervey et al. v. R. I. Locomotive Works, 93 U.S. 664; Heryford v. Davis, 102 U.S. 235. Intent is to be determined from all the circumstances surrounding the transaction. Upon consideration of all the evidence, it is concluded that the so-called lease transactions were not what they purported to be, and that petitioner was acquiring an equity in the equipment by means of making payments under the so-called lease agreements. From 1946 to 1949, petitioner *181 entered into contracts with 10 equipment dealers purportedly leasing 93 items of equipment for terms varying in length from 7 to 28 months. On the same day in which these agreements were consummated, they were assigned by the dealers, together with a consent to the assignment executed by petitioner and a chattel mortgage executed by the dealer to the Toy National Bank of Sioux City, Iowa, in consideration for the entire so-called rental called for by the alleged lease or occasionally for the full retail list price. Upon the expiration of the alleged lease term petitioner purportedly purchased the equipment in controversy upon payment of a small end payment. The end payment in each case was the difference between the total alleged rental and the retail list price of the item of equipment at the commencement of the so-called lease plus bank finance charges. The record in this case clearly shows that the petitioner would have preferred to purchase this equipment rather than rent it. Prior to 1946 petitioner had purchased, and not rented the bulk of its equipment. Even after the widening of the scope of its business, petitioner took care of its needs for equipment by making purchases to *182 the limit of its resources. When faced with a refusal of further bank credit to finance further equipment acquisitions, petitioner attempted to sell equipment debentures, but was unsuccessful. Petitioner solved its financing problem by making the arrangements represented by the so-called lease agreements. They did not have to appear as liabilities on petitioner's balance sheet as would have been true if regular installment purchase contracts had been made. It was petitioner's president who first approached the Toy National Bank of Sioux City. The bank agreed to the arrangement and thereafter actively solicited these transactions. The equipment dealers involved saw in the arrangement a means of getting all, or a greater part of their sales price at the inception of the so-called lease. Some of the dealers testified that these arrangements were becoming commonplace throughout the entire heavy construction industry, and they were forced to agree to such agreements or lose the petitioner's business, even though their prime interest was in selling this equipment, so that, in effect, they had no choice in the matter. None of these dealers set up the so-called leases as such on their books. *183 At the most, they put the equipment covered by the agreements into some sort of suspense account. Some dealers recorded the agreements as straight sales, having received their full, retail, list price from the bank in exchange for an assignment of the so-called lease and a chattel mortgage. At least 2 of the dealers paid a sales tax on the "lease" transaction. Only one dealer ever deducted depreciation on these items, and he did so following the advice of one of the respondent's agents who had audited his income tax returns. The dealers did not consider the equipment in controversy as being owned by them with reference to their own personal property taxes. The petitioner, at all times relevant herein, paid the personal property taxes on this equipment and took a deduction in its Federal income tax returns for such taxes. The economic aspect of these transactions is a factor which must be given weight in determining whether they were leases or installment sales. Until the issue was raised by the respondent in his statutory notice of deficiency, the petitioner considered this equipment to have a depreciable life of between four and eight years depending on the individual item involved. *184 Indeed, at the end of the alleged lease term petitioner assigned to these assets such useful lives for the purpose of depreciating the end payments. The agreements in controversy all were for terms of less than two years, except one which ran for 28 months. The terms of 37 were for less than one year, and 55 were for between one and two years. Petitioner, during the agreement term (which covered less than one-third, in most cases, of the estimated life of the equipment) paid an average of 77.20 per cent of the retail list price of the equipment. In Watson v. Commissioner, 62 Fed. (2d) 35, 36 it was said, "It is unthinkable that payment of * * * 43 per cent of the entire consideration * * * is annual rental." We think that there was no doubt that petitioner would pay the relatively small end payment at the end of the term of each agreement in order to acquire title to the equipment, in view of the years of prospective useful life. What was said in the case, In re Munger Fish Co., 9 Fed. (2d) 54, 56, applies here: "The final payment, which is nominally the purchase price, is so small in comparison with the entire purchase price as to leave no real choice to the 'lessee'. The obvious *185 purpose was to dispose of the machine under such conditions that when the 'lessee' had paid the 'rental' he could not afford to fail the relatively small final payment to obtain it. This would have been the obvious and natural, if not the inevitable, result. Evidently it was what the parties desired and intended to accomplish." From all of the evidence and the circumstances, we think that the only conclusion which can be made is that petitioner and the dealers intended and desired to work out sales of the 93 pieces of equipment. The above conclusion is made on the basis of all of the evidence and not upon any particular factor. But it seems to be pertinent to comment upon some of the facts, such as the use and eventual disposition of the 93 pieces of equipment by petitioner and the attitude of the dealers which were involved toward dealing in used equipment. At the time if the trial of this case, which was 4 years after the end of the agreements, 21 out of 93 pieces of equipment were still in petitioner's possession, 10 had been converted, 3 pieces had been scrapped, and 59 had been sold by petitioner. Of the 59 pieces which petitioner sold, 52 were sold for amounts which were greater *186 than the end payments, or the purported purchase price of each. In some instances, petitioner received as much as five times the amount of the end payment. Petitioner argues that shortages caused by the Korean War account for the high prices for which it was able to sell used equipment, and that therefore little weight should be given to the point. The record shows that scarcity in a time of war-time demand is not the primary explanation for the excellent prices petitioner obtained when it sold some of the used equipment. Some of such sales were made after the Korean War, in 1955 and 1956 for amounts in excess of the end payments. Petitioner's equipment manager testified that in his opinion market conditions during the Korean War period raised the market prices for used equipment only about 20 per cent. A pertinent question is whether the dealers here involved would have refused to transfer title to the items of equipment covered by the agreements in question at the end of the terms of the agreements, i.e., when the end payments became due, and could have been expected to take back each piece of equipment which, by then, was used equipment. From all of the evidence and circumstances *187 it must be concluded that the dealers did not intend to take back the equipment after all of the specified periodic payments had been made by petitioner. The evidence shows that the dealers in question were reluctant to deal in used equipment because of the expenses of overhauling and the financial risks involved in selling used equipment. For example, the market for the sale of used equipment was, on the whole, one in which marginal contractors (those having small amounts of capital) were the buyers. Also, the business of dealing in used equipment was highly competitive during the period when the agreements in question were made. This Court has given consideration to the economic factors in Chicago Stoker Corporation, supra; Judson Mills, supra, and in Truman Bowen, supra, and in the cases cited therein. These cases all involved agreements wherein the so-called rental payments over the period of the alleged lease approximated the agreed upon value of the property at the beginning of the term of the agreements. The agreements also provided for a small end payment (or in some instances no payment) at the end of the term, at the lessee's option, which would give him title to the asset. *188 This Court concluded in the above cited cases that under such facts it would be naive to presume that the option was in fact an option, and that no lessee would fail to make the end payments in order to obtain title. As was said in Chicago Stoker Corporation, supra, at p. 445, "If payments are large enough to exceed the depreciation and value of the property and thus give the payor an equity in the property, it is less of a distortion of income to regard the payments as purchase price and allow depreciation on the property than to offset the entire payment against the income of one year." We take the same view here. See, also, In re Munger Fish Co., supra, and In re Rainey, supra. It is true, as petitioner contends, that none of the agreements involved here contained options to purchase. Furthermore, witnesses, including five representative dealers, testified that petitioner was under no obligation and had no vested right to purchase the equipment in controversy at the end of the so-called lease term. But their testimony also establishes that it was an industry custom to offer the allegedly leased equipment for sale, first, to the so-called lessee, and that this was always done. *189 Also, the dealers and petitioner's secretary and construction manager testified that the amount of the end payment was computed by subtracting the alleged, total rental from the retail list price of the equipment at the commencement of the so-called lease and then adding to the bank's finance charges. Petitioner had, by the end of the so-called lease term, paid a substantial part of the list price of each item. Each item of equipment had more than half of its useful life remaining at the end of the so-called lease. If a piece of equipment were to be returned to a dealer at the end of a "lease," shipping charges had to be paid by petitioner in an amount which would be from $400 to $2,500. Under all of the circumstances, it was a foregone conclusion that petitioner would readily pay the end payment. The record shows that during the same period that the agreements in question were in effect, petitioner rented, without any doubt, approximately 30 pieces of similar equipment. Respondent allowed deductions for rental payments. Petitioner argues that these unquestioned leases were essentially the same as the agreements in controversy. We cannot agree. Those leases were treated differently *190 by the petitioner; they were kept segregated from the agreements which are here in controversy; they were contracted for directly by the project involved when the need for different or more equipment became evident; and rental payments were made directly from the project, and not by the main office. The terms of the 30 leases were much shorter, ranging for from 1 to 5 months; the equipment leased was to be used on the particular project where the contract was initiated; half of the equipment was not new. None of the 30 leases was assigned to a bank. Petitioner's contention that the 30 leases were similar to those in controversy is not supported by the evidence. Petitioner relies on Abramson v. United States, supra. In that case a construction company leased heavy equipment for a monthly rental of 10 per cent of the list price. The company had a history of prior equipment rentals. Rent was not paid during the months that the equipment was not in use, although the equipment remained on the lessee's premises with the lessor's permission. The company bought the equipment for a small end payment. The Court held that the agreements were leases, in fact. We think that the Abramson case is *191 distinguishable on its facts. Furthermore, the evidence in the Abramson case apparently did not show the length of leases involved, or the amounts of the end payments. In our opinion the factors which established in the Abramson case that the agreements were in substance leases are not present in the instant case. Nevertheless, it should be pointed out, that some of the reasoning of the Court in the Abramson case supports the respondent here. For example, the Court observed that "The amount of rentals previously paid, which in the ultimate negotiations was applied or credited on purchase price of the various items of equipment, cannot of course be allowed as a deduction for lease expense, but other rental payments for the years involved, not included in the purchase price, are properly allowable expense deductions in the operation of plaintiff's business." In the instant case, respondent contends, and we agree, that the amounts purportedly paid as rent were, in fact, credited on the purchase price of the equipment in controversy. The petitioner also relies on Estate of Clarence B. Eaton, supra. For the reasons set forth in Truman Bowen, supra, at p. 465, we believe the Eaton case *192 is distinguishable from this case. Upon consideration of all of the evidence, it is concluded that it was the intention of the parties to the so-called lease agreements relating to the equipment in dispute, that the petitioner would acquire an equity in the equipment as the result of making each so-called rental payment, and that petitioner did acquire an equity in each item. In Benton v. Commissioner, supra, and in Breece Veneer and Panel Co. v. Commissioner, supra, the courts took the view that it was error on the part of this Court to give considerable weight to "a purely objective economic test" in determining whether a particular transaction constituted a sale or a lease. In this case, after careful consideration of the entire record and of all of the factors, including the so-called economic factor, we are unable to sustain petitioner's contention that the agreements in question were intended to be, and were in fact, leases. It is held that the payments in question in each taxable year did not constitute rent within the scope of section 23(a)(1)(A). The respondent's determination is sustained. Issue 2 Petitioner makes an alternative contention in the event the question under *193 the first issue is decided for the respondent. Its alternative contention relates to the allowable deductions in 1948 and 1949 for depreciation of the 93 items of equipment which are involved in the first issue. It follows from the holding made under the first issue that petitioner must capitalize for the purpose of computing depreciation the sum of the periodic and the end payments which were made under the equipment agreements, plus capital additions. Petitioner has at all times consistently used the straight line method of depreciation of all its equipment. The respondent, in allowing depreciation of the 93 pieces of equipment involved here, computed the allowances under the straight line method. If his method is approved by this Court, the matter of his resulting figures is not in issue now because he has made certain revisions on the basis of evidence adduced during the trial of this case which are set forth in exhibit 33-E. His revised allowances for depreciation deductions are larger than he determined in the statutory deficiency notice and effect to his revisions will be given under Rule 50. Roughly, respondent's position now is that the total allowance for depreciation on *194 the 93 items of equipment amounts to $342,847.11 for 1948, and $312,568.40 for 1949, with certain adjustments for 1946 and 1947 with which we are not concerned. The petitioner contends that if the items are to be treated as purchased and capitalized, an accelerated rate of depreciation should be applied in the first two years of use. The chart below sets forth the rates of depreciation used by the Commissioner, and those proposed by the petitioner. The parties have agreed that a 10 per cent salvage value is to be taken in arriving at the depreciable cost. Rate
Estimated
of
Useful
Deprecia-
Rates Proposed by Western
Life
sion by
Proposed
Commis-
1st
2nd
3rd
4th
5th
6th
7th
8th
Class of Items
by Both
sioner
yr.
yr.
yr.
yr.
yr.
yr.
yr.
yr.
Off highway
hauling,
trucks,
waterwagons,
tractors,
scrap-
ers,
5 yrs.
20 %
45%
30%
10%
10%
5%
generators,
patrols
Tournapulls,
B-E Hydracrane
#3
4 yrs.
25 %
45%
30%
15%
10%
Diesel
Friction
Cranes,
Shovels
& Draglines
6 yrs. *
16.66%
25%
20%
20%
15%
10%
10%
under 4 Cu.
yds.
Electric
Cranes,
Draglines &
shovels over 4
8 yrs.
12.50%
25%
20%
20%
20%
10%
10
5%
5%
cu. yds.
Of the 93 items in controversy, petitioner and respondent have agreed that there is no dispute *195 under this issue as to 4 items. They have agreed, also, as to the acquisition date and cost basis for purposes of depreciation. Petitioner does not disagree as to the estimated useful life employed by the Commissioner. As can be seen from the above schedule, petitioner contends that the greater percentage of useful life was expended in the first two years of use. The reason advanced is that the equipment was subjected to extraordinary and severe exhaustion, wear and tear, in the production of petitioner's income. Under this issue, the ultimate question is whether the revised allowances for depreciation now determined by the Commissioner are correct, or whether the allowable depreciation is $595,611.99 for 1948, and $467,692.99 for 1949, as is claimed by the petitioner. Petitioner has the burden of proof under this question. The petitioner had, until this issue arose, consistently employed the straight line method of depreciation. This method assumes a uniform annual rate over the life of the asset and, under ordinary circumstances, no adjustments are made to reflect the increased or decreased usage of the property during any taxable year. The method contemplates setting aside in each *196 year a sufficient sum so that at the end of useful life, the aggregate of the annual deductions for allowable depreciation plus salvage value, will equal original cost. United States v. Ludey, 274 U.S. 295; Graves, Cox and Company, 27 B.T.A. 546. If the straight line method has been uniformly applied by the taxpayer in prior years, it should not be abandoned unless there is a cogent reason. Lake Charles Naval Stores, 25 B.T.A. 173. Petitioner, at no time prior to the filing of the petition in this case, requested a change in its depreciation method. See section 41, 1939 Code, and section 29.41.2, Regulations 111. It cannot now seek to effect such a change, and as we understand petitioner's contentions, it is not now attempting to do so. However, petitioner contends that excessive use, high speed, unusually long hours, difficult conditions, and untrained employees resulted in the consumption of the useful life of the equipment in question in the first years of operation. Prior to 1946, when the petitioner was engaged in paving and light construction work, its equipment was used on the basis of a 1-shift day, under more favorable climatic and soil conditions. When petitioner entered *197 the heavy construction field, it became necessary to operate multi-shifts during most of the year and with inexperienced help, to some extent. The conditions under which operations were carried on by petitioner in its post-1946 jobs were not always favorable. The jobs called for heavier equipment which was built to withstand the stress and strain caused by difficult conditions found on heavy construction projects. Because of the above factors, petitioner seeks allowance for depreciation at an accelerated rate, departing from the straight line method. However, there is no contention that the period of useful life has been shortened, and that this should be the basis for an increased annual rate of depreciation. If the petitioner had been on a "unit of production" basis, there would be more merit to its contentions. But under the straight line method, the principal question is whether the useful life of the equipment has been shortened. The straight line method contemplates reasonable variations from year to year in the use of depreciable assets, so long as the remaining use life of the assets is not reduced below the term of years originally selected. Copifyer Lithograph Corporation, 12 T.C. 728. *198 However, within the straight line method, a taxpayer will be allowed an additional amount for abnormal depreciation, if this abnormal depreciation can be proved. Alvin Glen Hall, 7 T.C. 1220; Estate of Clarence B. Eaton, supra.It is not enough, however, merely to show that the property has been subject to abnormal or excessive use. To justify an increased rate of depreciation, it must be shown that, in fact, such factors did materially reduce useful life. Giles E. Bullock, 26 T.C. 276; Roundup Coal Mining Co., 20 T.C. 388; H. E. Harman Coal Corporation, 16 T.C. 787, aff'd on this point, 200 Fed. (2d) 415; Harry Sherin, 13 T.C. 221; Copifyer Lithograph Corporation, supra. Petitioner's witnesses testified to the abnormal conditions under which the equipment here in controversy was used. They painted a graphic picture of the effect that multi-shift operations with inexperienced labor can have on equipment. We have been told that night work lessens the opportunity for watching the equipment and thereby noticing certain indications of internal trouble. We fully understand the effect that different soil conditions, climates, and terrain have on this equipment. However, we are *199 not convinced that these factors actually did shorten the useful lives of the equipment in controversy. On each project, petitioner maintained a repair shop and staff sufficient to make all necessary repairs in order to keep the equipment in operating condition. The equipment in question was all of a heavy duty type, built to operate under conditions that were far from ideal. Petitioner's witnesses testified that the above conditions caused excessive wear on such items as tires, caterpillar tracks, transmissions, and rear ends. However, petitioner's mechanics and project supervisors testified that if any of these items broke down, they were immediately replaced, so as to keep the equipment in production. The cost of these replacements was not capitalized, but properly was charged off as expenses. As a result, petitioner's repair expense was substantially increased in 1948 and 1949. But stepped up repairs do not necessarily mean deterioration, and there may be evidence that the repairs adequately compensated for the increased wear and tear. Copifyer Lithograph Corporation, supra.Moreover, where accelerated use is accompanied by an increase in maintenance, accelerated depreciation *200 is allowable only to the extent that the maintenance and repair does not arrest the acceleration of depreciation. Woodside Cotton Mills Co., 13 B.T.A. 266. Petitioner's equipment manager testified that he examined all equipment on all of the projects three or four times a month. The master mechanic on each project examined and operated each item of equipment at least twice a week. These inspections were only for the purpose of noticing signs of impending sources of trouble, and the parts that would soon need repair or replacement. We find no evidence that the equipment in controversy was ever inspected with a view to determining remaining useful life. Indeed, petitioner's witnesses all testified in the abstract when stating the claimed specific percentages of depreciation; they did not establish with respect to pieces or classes of equipment, specifically, that heavy use actually had shortened the useful life, or that a larger percentage of useful life of specific equipment had been used up in the first two years of use. The equipment was never actually dismantled in any way to inspect it and ascertain its condition as of the end of a particular year, or at the conclusion of a particular *201 contract. The internal working parts of the equipment were never actually inspected for wear unless the particular item of equipment had to be dismantled to make a repair to keep it operating. No actual determination was made by petitioner as to the probable remaining life expectancy of any particular item of the equipment in controversy. Petitioner made some studies showing (without breakdown) the total hours of use of all equipment at various projects. Careful consideration has been given to those hours of use studies and charts, but it must be concluded that they are ineffective under the burden of proof of petitioner. We also find it significant that petitioner did not request accelerated depreciation for any of the equipment that it owned outright even though such equipment was of the same type as the equipment here in controversy and was used side by side with that equipment during the years involved. In this aspect, petitioner's contention here is inconsistent. In addition, petitioner, at the time of making the end payment on the equipment in controversy, assigned the same useful life to each item of equipment that respondent assigned in making his final, revised determinations. *202 As has been pointed out above, in the first issue, at the time of the trial of this case, petitioner still retained 21 pieces of all of the items in controversy, a point well beyond the term of the Commissioner's estimated useful life for each type of equipment. The petitioner sold 59 of the items, of which 52 were sold for more than the end payment, and 15 of the items were sold by petitioner for as much, or more, than the total acquisition cost. Of the 59 items, petitioner sold 34 before the end of the estimated useful life determined by the Commissioner. Each of the 34 was sold near the end of the period of estimated useful life. Only three of the items were scrapped. All of these facts militate against the contention that the useful life of the equipment in question was materially reduced. In Giles E. Bullock, supra, in considering a similar argument, this Court said (p. 280) as follows: "* * *, it [the party claiming an accelerated or higher rate of depreciation] must establish the reasonableness of the new [proposed] rate by showing through testimony [proof] based upon a physical examination of the machinery that increased use and other factors not accounted for in the old *203 rate have, in fact, materially reduced the machinery's useful life." After thorough consideration of all of the evidence under this issue, we are obliged to conclude that petitioner did not keep such records and make such physical examination of the 93 items of equipment involved as to provide the required proof here that "increased use and other factors not accounted for" in the normal rate under the straight line method in fact materially reduced in any particular year the useful life of each item, or class, comprised in the group of the 93 items of equipment. Evidence of increased usage alone is insufficient to support petitioner's claim in this case. "The rate of depreciation under the straight line method is not necessarily proportionate to the use to which the depreciable asset is being put. Evidence of increased repairs is also insufficient, since they may be due to inflated costs and may, in fact, have resulted in retarding the exhaustion of the equipment." Giles E. Bullock, supra, p. 280. It is held that the petitioner has failed to sustain its burden of showing that it is entitled to higher rates of depreciation than respondent has allowed. Respondent's revised determination *204 of the total allowable depreciation deductions for 1948 and 1949 are sustained. Decision will be entered under Rule 50. Footnotes
*. Trade in value; traded for other equipment. ↩
**. Used equipment was acquired.↩
*. Trade in value; traded for other equipment. ↩
**. Used equipment was acquired.↩
*. As to one diesel crane, Commissioner employed a useful life of seven years.↩